**R.W. INTERNATIONAL CORP. and
T.H. Ward de la Cruz, Inc.,
Plaintiffs, Appellants,**

v.

**WELCH FOOD, INC., et al.,
Defendants, Appellees.**

No. 93–1704.

United States Court of Appeals,
First Circuit.

Heard Nov. 3, 1993.

Decided Jan. 20, 1994.

---

Jose A. Hernandez Mayoral with whom Rafael Hernandez Mayoral was on brief, for appellants.

Jaime E. Toro–Monserrate with whom Samuel T. Cespedes and Ana Matilde Nin were on brief, for Welch Food, Inc.

Jorge I. Peirats with whom Jacabed Rodriguez Coss was on brief, for Magna Trading Corp.

Before BREYER, Chief Judge, COFFIN, Senior Circuit Judge, and BOUDIN, Circuit Judge.

COFFIN, Senior Circuit Judge.

The parties in this action attempted to negotiate a long-term distribution relationship, but after a year of haggling, defendant Welch Foods, Inc. (Welch) notified plaintiffs R.W. International Corp. (R.W.) and T.H. Ward de la Cruz, Inc.,[1] that it was calling off the corporate marriage because of irreconcilable differences. Plaintiffs claimed that the dissolution of the relationship violated the Puerto Rico Dealers' Contracts Act, P.R.Laws Ann. tit. 10, § 278 (Law 75), and federal and state antitrust laws. Plaintiffs also alleged a claim of tortious interference with contractual relations against defendant Magna Trading Corp., supervisor of Welch's operations in Puerto Rico.

The district court concluded that the association between the parties had not yet matured into a relationship protected by Law 75, and it consequently granted summary judgment for defendants on the Dealers' Act and tort claims. It dismissed the antitrust

---

1. These two related corporations are both in the food distribution business. According to answers to interrogatories, R.W. does marketing for mainland corporations and accounting for De la Cruz, Inc. De la Cruz, in turn, distributes but does not purchase products from producers. It makes purchases from Impex Trading, another related company. *See* District Court opinion at 5 n. 2. For convenience, we refer to these companies jointly as either "plaintiffs" or "R.W.".

claims on the ground that plaintiffs had failed to make the required showing of injury to competition. Our review of the caselaw and circumstances persuades us that only the antitrust claims properly were dismissed. We therefore reverse the summary judgment on the other causes of action.

## I. *Factual Background*

■ The facts underlying this dispute essentially are undisputed, with the parties differing only with respect to their legal significance. Our review of the district court's grant of summary judgment is plenary. *Cambridge Plating Co. v. Napco, Inc.*, 991 F.2d 21, 24 (1st Cir.1993).

Welch, a producer of fruit juices and related products, has sold its products through local distributors in Puerto Rico since the 1930s. In 1987, Welch needed a new distributor for its frozen concentrate line of products, and, with the help of its local broker, Magna Trading, it identified R.W. as the most suitable—though not perfect—candidate.

From the beginning of Welch's interest in R.W., company executives had concerns about R.W.'s handling a competing line of juice products under the "Donald Duck" label. Welch's international marketing manager initially had suggested internally that R.W. would have to drop the Donald Duck line "to be a viable option," *see* App. at 213, but he later reported that R.W.'s owner, Thomas Ward, had agreed to undertake several measures to assure that the Welch frozen concentrates would receive full support despite the continued presence of the Donald Duck products. These included "[a] trial period with no commitment by Welch's for a larger period of representation," App. at 219, and a financial contribution from R.W. for advertising Welch's product.

Discussion among the parties took place through the early months of 1988 and, on March 25, Welch's international marketing manager wrote to Ward to announce his company's decision:

... I am pleased to inform you that Welch's has reached a decision to continue the frozen concentrate distribution and sales business begun by Ventura Rodri-guez in Puerto Rico by transferring our account to R.W. International.

Confirming our conversation on Monday, Welch's will proceed to draft an agreement calling for the appointment of R.W. International in Puerto Rico for a one-year trial period....

App. at 364. Four days later, on March 29, Welch notified its customers that it had

made the decision to appoint R.W. International and its distributing affiliate T.H. Ward de la Cruz Inc. as its distributors in Puerto Rico for Welch's frozen product line. This change will go into effect as of this date and a written agreement is expected to be arrived at in the near future.

App. at 366 (translation in appendix to appellant's brief).

The parties immediately began doing business, with plaintiffs regularly submitting purchase orders and defendants delivering the merchandise and billing plaintiffs. It was not until three months later, however, in late June, that Welch submitted a proposed contract to plaintiffs. Ward responded in August with a counterproposal. Of particular concern to the Puerto Rico company were provisions in the agreement that appeared to reflect an effort by Welch to bypass Act 75, which subjects companies to substantial damages if they terminate dealership contracts for other than "just cause." The Welch document, for example, characterized the relationship with R.W. as a transfer of the contractual arrangement that had existed between Welch and its prior distributors before the passage of Act 75. Welch's draft also specified that New York law would govern the agreement. R.W.'s revised draft, *inter alia*, deleted the "transfer" language and specified that Puerto Rico law would apply.

In mid-October, after a series of telephone conversations between attorneys, Welch submitted a third proposed draft of the agreement, which reinstated all of the language that had been of primary concern to R.W. During a visit to Puerto Rico in early December and in subsequent correspondence, Welch's international marketing manager encouraged Ward to complete the contract negotiations "as soon as possible." On January

30, 1989, Ward responded by letter stating that he, too, was anxious to finalize the agreement, but that there were a few items "that your lawyer insists on and that we feel are not in the best interest of our future relationship." In response to an inquiry about R.W.'s investing $50,000 in a promotional campaign, Ward noted that the commitment was not yet ripe because he had agreed to make this expenditure "once we as a company[ ] held a working agreement with Welch's." A follow-up letter sent by Ward on February 8 to the president of Magna Trading reiterated concerns about the "transfer" concept as a means of "avoid[ing] Law 75 constraints."

At this point, the applicability of Law 75 remained the only significant point of contractual disagreement between the parties. They had resolved earlier conflicts as to which of Ward's entities would be named specifically in the contract (only R.W.), and whether R.W. would have an exclusive distributorship during the one-year trial period (no).

The companies had been continuing to do business throughout the negotiation period. Late in 1988, the relationship appeared to be working well; Magna Trading's president, Roberto Giro, wrote to Ward in early December to commend him for exceeding by 11 percent the goal on a special product promotion. Early in 1989, however, Giro began to express concern about R.W.'s side-by-side handling of the Welch and Donald Duck products. On January 20, he wrote to Welch's marketing manager indicating discomfort with Ward's involvement in a new line of Donald Duck grape juice products. This concern escalated, and Giro wrote again on March 22 suggesting that R.W. was not giving priority to Welch products as it had promised to do.

On March 30, 1989, Welch's international vice president, William Hewins, informed Ward in a letter of Welch's decision "to discontinue the existing pre-trial relationship ... and, therefore, putting an end to the one-year trial or probationary relationship for our frozen concentrate products." The letter continued:

As you know, the idea of working together on a one-year trial basis was, as per your recommendations, to determine if Welch's frozen concentrates could be handled to our satisfaction in spite of your handling a competitive product. The pre-trial relationship proved to us that the conflicts of interest of your representing both competing lines are significant and irreconcilable.... An increased level of conflict in personal relations between our broker and R.W. International has also been noted, tracing to conflicts between the brands represented by the two firms.... Instead of complementing one another, as was your original premise, these brands represent conflicting interests for you and us....

Because Welch terminated the relationship before the parties reached an agreement in writing, the one-year trial period envisioned at the outset of their dealings never even commenced.

Plaintiffs filed this action in April 1989. Their amended complaint alleges that Welch terminated their dealership agreement without just cause in violation of Law 75; that Magna Trading tortiously interfered with their contractual relationship with Welch; and that defendants violated antitrust laws by threatening, and then later actually terminating, plaintiffs' dealership if R.W. did not agree to drop Donald Duck products, and by seeking to monopolize the bottled grape juice market through a price-cutting war. The case was dismissed once on improper procedural grounds, *see R.W. International Corp. v. Welch Foods, Inc.*, 937 F.2d 11 (1st Cir. 1991), and, following remand, dismissed again on defendants' motions for summary judgment.

In this appeal, plaintiffs maintain that all of their claims are viable. They argue that, contrary to the district court's ruling, precedent on Law 75 establishes that the statute *does* govern the business relationship within which R.W. and Welch operated for a year. They assert that this arrangement also provides a basis for their tortious interference claim against Magna. In addition, plaintiffs argue that their antitrust allegations were sufficient to withstand defendants' summary judgment motion and that, if their showing

were deficient, the court erred in dismissing the claims without first allowing discovery.

## II. *Applicability of Law 75*

■ Law 75 provides that, notwithstanding any contractual provision to the contrary, the supplier in a distribution contract may terminate a dealership only for "just cause." P.R.Laws Ann. tit. 10, § 278a.[2] The statute was intended to protect Puerto Rico dealers from the harm caused when a supplier arbitrarily terminates a distributorship once the dealer has created a favorable market for the supplier's products, "thus frustrating the legitimate expectations and interests of those who so efficiently carried out their responsibilities," *Medina & Medina v. Country Pride Foods, Ltd.*, 858 F.2d 817, 820 (1st Cir.1988) (reproducing in full translation of Puerto Rico Supreme Court's response to certified question, 122 P.R.Dec. 172 (1988) (citing legislative reports)). The Act has been described as "very much a 'one-way street' designed to protect dealers from the unwarranted acts of termination by suppliers," *Nike Int'l Ltd. v. Athletic Sales, Inc.*, 689 F.Supp. 1235, 1237 (D.P.R.1988).

For purposes of its summary judgment motion, Welch did not dispute that R.W. and its affiliates were performing the functions of a distributor within the meaning of Law 75 during the twelve months the parties were doing business, *see* P.R.Laws Ann. tit. 10, § 278(a).[3] Welch's position was, and is, that these operations occurred during a kind of "twilight zone" period while the parties attempted to negotiate in good faith the terms that would govern their actual relationship. Because the negotiations failed, the relationship never materialized, and so, in Welch's view, Law 75 never was implicated.

The district court accepted this argument, concluding that Law 75 was not meant to apply to a period of preliminary negotiations preceding a completed working agreement between a supplier and distributor. The court noted that keeping operations in abeyance during a good-faith negotiating process "would allow distributors to sit and wait while the principal loses its market—obtaining, literally without any effort, a stronger bargaining position every day it waits." Applying Law 75 to dealings during that period, however, "would curtail the autonomy required for arms-length negotiations." Neither approach would serve the statute's purpose of "improving and permitting a system of free competition."

Plaintiffs' challenge to this judgment is straightforward. Law 75 makes no distinctions among distributorship arrangements, they assert, be they described as pre-trial, preliminary, temporary or tentative. The only relevant point of inquiry is whether R.W. and its affiliates were performing as a dealer under the statute; if so, Law 75 governs. R.W. thus contends that, because Welch concedes dealer status, its decision to terminate the relationship must be judged under the statute's "just cause" test.

■ We are persuaded that plaintiffs' position is the correct one. Their most compelling support is provided by the statutory language, which defines a "dealer's contract" subject to Law 75 as:

[a] relationship established between a dealer and a principal or grantor whereby *and irrespectively of the manner in which the parties may call, characterize or execute such relationship,* the former actually and effectively takes charge of the distribution of a merchandise, or of the rendering of a service, by concession or franchise, on the market of Puerto Rico.

P.R.Laws Ann. tit. 10, § 278(b) (emphasis added). The statute clearly incorporates within its reach *any* arrangement between a supplier and dealer in which the dealer is actually in the process of distributing the

---

**2.** The provision states in full:

Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew

said contract on its normal expiration, except for just cause.

**3.** This provision defines a "dealer" as a "person actually interested in a dealer's contract because of his having effectively in his charge in Puerto Rico the distribution, agency, concession or representation of a given merchandise or service."

supplier's merchandise in Puerto Rico. The statute does not apply to suppliers' simple sales to Puerto Rican wholesalers. It insists upon establishment of a "supplier/dealer" relationship. But once that relationship is established, the statute applies irrespective of the length of time such an arrangement has been in existence, and it explicitly rejects any efforts by the parties to foreclose coverage through semantic niceties. Welch's concession that R.W. was acting as a dealer (for purposes of summary judgment) thus seems dispositive.

Welch, however, asserts that the statute is not meant to be as inclusive as its language suggests, and it offers several reasons to support this position. In our view, each falters upon close scrutiny.

First, Welch claims that the word "established" in the provision indicates that Law 75 applies only once the parties have achieved a certain level of stability. The parties in this case may have been working with each other, Welch observes, but their failure to reach agreement on essential terms meant that their relationship was never "established" within the meaning of Law 75. In support of this argument, Welch cites language from cases describing the Law 75 relationship as "characterized by its continuity, stability, mutual trust, coordination between both parties as independent entrepreneurs," *J. Soler Motors, Inc. v. Kayser Jeep Int'l Corp.*, 108 P.R.Dec. 134, 145 (1978) (Official Translation); *see also Roberco, Inc. v. Oxford Industries, Inc.*, 122 P.R.Dec. 117 (1988), Official Translation of the Supreme Court of Puerto Rico, slip op. at 5 (June 30, 1988); *Medina & Medina*, 858 F.2d at 822.

■ We cannot agree that a relationship is "established" within the meaning of Law 75 only *after* a supplier and dealer have reached the point at which their relationship might be described as "stable" or "continuous." Although the statute was enacted to protect from abrupt and arbitrary termination dealers whose longstanding representation had provided substantial economic benefit to the manufacturer, the law is drafted to govern relationships from their inception to ensure that they will both become and remain stable and continuous. *See Medina & Medina*, 858

F.2d at 820 (Act 75 levels bargaining power between manufacturer and dealer "[i]n order to achieve reasonably stable dealership relationships in Puerto Rico"). Although the precedent cited by Welch describes the type of longstanding commercial partnership that gave rise to Law 75, we do not read the cases to exclude fledgling relationships from the act's coverage. A well-established dealer may have more to lose—and may have provided more benefit to the supplier—than a dealer with less tenure, but the statute makes no distinction between them.

■ Nor can it be said that a relationship is established within the meaning of Law 75 only if it is committed to writing. Indeed, Welch's counsel acknowledged at oral argument that a relationship subject to the statute may be established through a course of dealing, but argued that this was not such a case because the parties continued to disagree over the essential terms of their affiliation throughout their entire collaboration. In other words, Welch contends that this relationship was not established because its terms still were being negotiated.

While it is true that the parties had yet to agree on the dimensions of their future relationship, the fact remains that they were operating as business partners under *some* terms for a full year. Plaintiffs sent purchase orders to Welch approximately once a week between March 1988 and March 1989, and Ward's companies were actively involved in distributing Welch products throughout that time. As noted above, Ward received a commendation from Magna Trading's president for its effort in a successful special promotion. To be sure, the relationship envisioned by the parties when they began to do business never materialized; the relationship protected by Law 75, however, was the one that actually existed.

Welch's second argument, that applying Law 75 during a period of preliminary negotiations improperly burdens the parties' liberty to contract, is the one the district court found particularly convincing. When parties freely have agreed that a trial period will precede establishment of the long-term relationship Law 75 is intended to protect, the

company asserts, invoking the Act before conclusion of the trial period is tantamount to coercing the parties into a contract neither agreed to enter. This is particularly harmful to the supplier, Welch maintains, because Law 75 is designed to empower dealers. Thus, a supplier who is not allowed to step away from an unsuccessful attempted relationship would be forced into accepting the dealer's terms and conditions, with the consequent loss of its financial and legal autonomy.

We detect several problems with this argument. In the first place, as we have noted, the parties in this case were not simply negotiating a relationship to be activated sometime in the future. R.W. had been serving as Welch's Puerto Rico dealer for twelve months. While we would have no difficulty in accepting that a supplier could break off negotiations, no matter how long they had been going on, the issue before us is whether Welch can terminate an actual dealership relationship that existed contemporaneously with the negotiations. Welch wants to insulate those dealings from Law 75 because they were part of a longer-term plan. The statute, however, plainly states that the characterization of a relationship (e.g., calling it temporary or preliminary) does not affect its status under Law 75. If the parties are dealing, a dealership exists for purposes of the Act.

This bright line makes sense. Otherwise, suppliers could insist on various types of contingency arrangements to avoid Law 75's restrictions for substantial periods of time. Although Welch's concerns about R.W.'s capacity to perform in the face of a potential conflict of interest seem legitimate, delaying Law 75's coverage until long after the dealership relationship began would allow Welch to terminate for any reason whatsoever. Welch, for example, could forsake R.W. without recourse and without regard for any ef-forts taken by R.W. to gear up for Welch's business, if another dealer willing to accept a smaller commission suddenly became available. Moreover, there seems to be no principled distinction between Welch's one-year trial period and a supplier's effort to designate a three- or even five-year "preliminary" distributorship before deciding on a long-term relationship. To rule that a contingent relationship is outside the scope of Law 75 is thus to allow a significant loophole in the protection the Puerto Rico legislature sought to provide.

In the second place, we fail to see how applying Law 75 in the circumstances of this case necessarily would require Welch to continue a relationship it does not want in a manner to which it has serious objections. Law 75 simply requires a supplier to justify its decision to terminate a dealership. If Welch's conflict-of-interest concerns about R.W. are legitimate, we have no doubt that this would constitute "just cause" under Law 75. *See Medina & Medina,* 858 F.2d at 823–24.[4] Thus, applying Law 75 here does not force a contract onto unwilling parties; it simply imposes conditions on an existing relationship.

Finally, the liberty of contract argument stumbles insofar as it presumes that only the supplier will suffer if, to avoid application of Law 75, the parties refrain from dealing until they have reached final agreement on all terms to govern their long-term relationship. The manufacturer and the dealer share an interest in maximizing sales of the product, and it would be no more to the dealer's advantage than to the manufacturer's for a market to slip away while the parties are engaged in protracted negotiations. We therefore disagree with the district court's view that dealers will gain unfair advantage in bargaining if Law 75 is triggered as soon

---

4. *Medina & Medina* is not precisely on point because it involved a supplier's decision to totally withdraw from the Puerto Rico market following good-faith negotiations that failed to achieve agreement between the parties. There is no indication here that Welch intended to leave the market rather than find a new dealer. Nevertheless, we believe the principle underlying *Medina & Medina* is equally applicable in these circumstances, i.e., that a supplier has just cause to terminate if it has bargained in good faith but has not been able "to reach an agreement as to price, credit, or some other essential element of the dealership," 858 F.2d at 824. This would be true at least where, as here, the supplier's market in Puerto Rico was well established before the current dealer relationship and the supplier's action therefore "is not aimed at reaping the good will or clientele established by the dealer," *id.*

as the parties start dealing. Both sides have an incentive to reach agreement at the earliest possible time. To the extent a supplier's future flexibility is diminished by its choice to begin dealing before all issues have been resolved, this is a result intended by the legislators who enacted Law 75.

In short, the practical effect of activating the Dealers' Act as soon as the parties start conducting business as supplier and dealer is to ensure that, right from the start, the relationship is marked by a certain level of commitment from the supplier. This does not entirely deprive suppliers of the opportunity to evaluate the suitability of a particular match through a "test period." It simply means that the relationship can be severed without consequence only for just cause, i.e., if the dealer fails a meaningful test. This should not trouble suppliers engaged in good-faith negotiations, for their goal is to produce a long-term working agreement. If, on the other hand, a preliminary "understanding" disintegrates into impasse over essential terms, a finding of "just cause" seems likely. Law 75 is not intended to extend unworkable relationships, but only to prevent arbitrary terminations. *See Medina & Medina,* 858 F.2d at 823–24.

Of course, whether or not statutes of this kind are sound policy is not our concern. Perhaps a case can be made for having a fixed period during which the relationship is probationary and the statutory rights under Law 75 do not vest; this is typical for tenure arrangements in government employment and in the academic world. But the legislature has not enacted such a window, as we read the present statute, and it is not for us to amend the statute in the guise of construction.

Welch's effort to bolster its position through reliance on *Medina & Medina* and another case involving a novel Law 75 question, *Nike Int'l Ltd. v. Athletic Sales, Inc.,* 689 F.Supp. 1235 (D.P.R.1988), is unavailing. In *Medina & Medina,* the Puerto Rico Supreme Court held that a supplier may withdraw from the Puerto Rico market without consequence under Law 75 if "the parties

have bargained in good faith but have not been able to reach an agreement as to price, credit, or some other essential element of the dealership," 858 F.2d at 824. Welch contends that the district court's ruling, allowing the company to call off the protracted, unsuccessful negotiations with R.W., is faithful to that decision.

In *Medina & Medina,* however, the Puerto Rico Supreme Court did not rule that a temporary relationship pending completion of negotiations is outside the scope of Law 75, but it held that the failed negotiations over price and credit terms provided *just cause* for the supplier's decision to terminate the distributorship a year after it began.[5] Until that case, it was unclear whether a supplier could terminate without consequence for any reason other than the dealer's adverse actions. *Medina & Medina* does help Welch, in that it allows an argument that failed negotiations may support a finding of "just cause," but it does not bolster the company's argument that preliminary dealings fall outside Law 75.

In *Nike,* a federal district court permitted termination of a dealer who failed to give the contractually required written notice to the supplier of its intent to renew the contract. 689 F.Supp. at 1239. According to Welch, *Nike* stands for the principle that dealers may not avoid the express terms of agreements to which they willingly subscribe. Consequently, the company argues, the district court properly held appellants to their own characterization of the arrangement as a preliminary test period.

This argument stretches *Nike* far beyond its legitimate boundaries. *Nike* addressed only whether Law 75 released a dealer from an explicit renewal procedure contained in the distributorship contract. Noting that the statute's purpose was to protect against unjustified termination *by the principal,* the court ruled that it had no effect on mutual agreements specifying the manner in which a dealer must notify a supplier of its desire to continue their relationship. *See* 689 F.Supp. at 1239. In other words, while Law 75 takes

---

**5.** The dealership contract between Medina & Medina and Country Pride contained no time limit. Product prices were set periodically by mutual agreement. 858 F.2d at 818.

away from the supplier the right to make a subjective decision to terminate, other than for "just cause," the parties may agree to a contractual procedure that gives *the dealer* the power either to end or to continue the relationship after a given period of time. *Nike* holds that Law 75 does not protect the dealer from its own failure to follow that procedure.

This case is simply not equivalent to *Nike*. Welch, in essence, claims that the parties agreed that Welch would have the power to terminate their relationship after a preliminary test period, without regard to just cause. This, however, is precisely the imbalance of power to which Law 75 was directed, and the statute invalidates such an agreement. Under Law 75, a principal may not wield unilateral authority to terminate a dealership relationship for other than just cause.

In sum, we find no basis upon which to exclude the ongoing commercial dealings between Welch and R.W. from the embrace of Law 75. The district court's grant of summary judgment therefore must be reversed so that the court may consider whether Welch had "just cause" for terminating the relationship.[6] Because summary judgment on the claim for tortious interference with a contractual relation was premised on the Law 75 holding, that decision also must be vacated and remanded for further consideration. The remand on the tortious interference claim is without prejudice to any argument Welch may be making that, regardless of the existence of a relationship protected by Law 75, there was no contract protected against tortious interference.

### III. *Antitrust Claims*

In January 1989, R.W. introduced a new Donald Duck bottled grape juice into the market with an intensive promotional campaign. Plaintiffs allege that defendants' reaction to the new product, and R.W.'s representation of it, violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, as well as Commonwealth antitrust law, P.R.Laws Ann. tit. 10, §§ 258, 260. The principal actions cited by plaintiffs in their amended complaint were (1) discussions in which Welch and Magna expressed "anger ('molestia'), discomfort and preoccupation with Plaintiffs' handling of the 'Donald Duck' bottled grape juice," Amended Complaint at ¶ 78; (2) a "massive promotional campaign" for Welch's own bottled grape juice, and a price cutting war, "in order to block out the entrance [of] the 'Donald Duck' bottled grape juice into the Puerto Rican market," *id.* at ¶¶ 82, 91; and (3) the decision of Welch to terminate its relationship with plaintiffs because R.W. did not drop representation of the Donald Duck juice, *id.* at ¶ 81.

The district court granted summary judgment on these claims, concluding that plaintiffs had failed to demonstrate a genuine issue of material fact as to whether defendants' actions constituted either a conspiracy in restraint of trade in violation of § 1 of the Sherman Act,[7] or an unlawful conspiracy to monopolize the bottled grape juice market in violation of § 2.[8] Of greatest significance to the court was a declaration from one of Magna's principals, Francisco Gil, stating that Donald Duck bottled products had reached, within a short period of time, at least 80 percent of the stores typically carrying such products. The court found that summary judgment was proper because "plaintiffs never responded to Welch's claim that [ ] competition has not been injured, and that the Donald Duck bottled grape juice was successfully introduced into the Puerto Rico market."

Plaintiffs claim on appeal that the court improperly and prematurely dismissed their

---

**6.** We recognize that Welch conceded that R.W. was performing as a dealer only for purposes of its summary judgment motion, and that, consequently, this issue also may surface again on remand.

**7.** Section 1 makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations...." 15 U.S.C. § 1.

**8.** Section 2 makes it an offense for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations...." 15 U.S.C. § 2.

antitrust claims. Much of their brief on this issue, however, is devoted to an off-the-mark argument concerning the court's failure to treat the allegations in their complaint liberally. The court did not dismiss the antitrust claims based on the pleadings, but ruled that plaintiffs had failed to substantiate in any way their conclusory allegations in response to defendants' summary judgment motion and accompanying declaration. Our review of the district court's decision consequently focuses solely on the appropriateness of summary judgment.

*Section 1 of the Sherman Act.* As argued by plaintiffs in their appellate brief, the unreasonable restraint of trade underlying their § 1 claim was an alleged threat by Welch (as part of a conspiracy with *Magna*) to terminate plaintiffs' dealership and the subsequent actual termination of the relationship. These actions presumably were alleged to violate the antitrust laws based on their impact in pressuring plaintiffs to drop the Donald Duck line of products, thereby suppressing competition among grape juice manufacturers.

■■■ Heavy-handed competitive tactics alone do not constitute an antitrust violation, however. To survive defendants' motion for summary judgment, plaintiffs needed to demonstrate a genuine dispute as to whether defendants' actions caused an injury to *competition,* as distinguished from impact on themselves. *See, e.g., Spectrum Sports, Inc. v. McQuillan,* —— U.S. ——, ——, 113 S.Ct. 884, 892, 122 L.Ed.2d 247 (1993) ("The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."); *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 767 n. 14, 104 S.Ct. 2731, 2739 n. 14, 81 L.Ed.2d 628 (1984) (" '[T]he antitrust laws ... were enacted for "the protection of *competition,* not *competitors.*" ' ") (citations omitted) (emphasis in original); *Clamp–All Corp. v. Cast Iron Soil Pipe Inst.,* 851 F.2d 478, 486 (1st Cir. 1988) (" 'Anticompetitive' ... refers not to actions that merely injure individual competitors, but rather to actions that harm the competitive process."). Once defendants presented a declaration averring that the

Donald Duck products successfully entered the market during the relevant period of time—indicating a lack of injury to competition—plaintiffs were obliged to counter that statement with more than the bare allegations contained in their complaint. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 584–87, 106 S.Ct. 1348, 1354–56, 89 L.Ed.2d 538 (1986).

Plaintiffs responded with a statement from R.W. owner Ward, which stated, in relevant part:

2. During the last months of 1988 R.W. International Corp. became the broker of Donald Duck bottled grape juice.

3. Shortly after the introduction in the market of the Donald Duck bottled grape juice, Welch's began an intensive promotion of their bottled grape juice products.

4. This intensive promotion of the Welch's Grape bottled products caused [ ] the introduction of the Donald Duck bottled grape juice be severely suppressed.

5. Upon information and believe [sic], this intensive promotion was carried out in conjunction with Magna Trading Corporation to eliminate the Donald Duck bottled grape juice from [the] Puerto Rico market.

The district court concluded that this statement was insufficient to generate a genuine factual dispute because it left unchallenged defendants' assertion that the Donald Duck bottled juice had deeply penetrated the Puerto Rico market during the period of defendants' allegedly unlawful conspiracy. The court observed:

[A]s the Puerto Rico Supreme Court has recognized, distributors are in contact with the retailers, consumers, and the different components of the trade. *Medina,* 817 [858] F.2d at 823 n. 6. Plaintiffs were in the position to show, based on their knowledge of the Puerto Rico market, the effects of Welch's conduct on the market.... However, other than the conclusory allegation that their line had been "severely suppressed," plaintiffs never responded to Welch's claim that the competition has not been injured, and that the Donald Duck bottled grape juice was successfully introduced into the Puerto Rico market.

The district court's decision and explanation are unimpeachable. Plaintiffs may have felt pressured to drop the Donald Duck products in order to preserve the Welch dealership, and may have suffered economic consequences from Welch's decision to terminate, but these circumstances are irrelevant insofar as an antitrust violation is concerned. Plaintiffs' failure to rebut defendants' assertion that Donald Duck bottled grape juice had no problem entering the market—an implicit assertion that competition was *not* affected—fully justifies the district court's decision to grant summary judgment for defendants.

Plaintiffs take issue with the significance of defendants' penetration figure, arguing that each of the stores carrying Donald Duck juice may have had only a single bottle of that brand while displaying shelves full of Welch products. We agree with the district court, however, that such information, if true, could have been obtained easily by plaintiffs, and its absence is thus not a proper basis upon which to withhold summary judgment from defendants.[9]  *See infra* at 488 (denial of discovery).

■ *Section 2 of the Sherman Act.* Plaintiffs' § 2 claim characterizes defendants' promotional campaign, in which Welch reduced prices on its bottled grape juice, as an impermissible effort to gain monopoly control of the bottled grape juice market in Puerto Rico. In light of R.W.'s success in introducing the Donald Duck juice, this claim is wholly without merit.

The Supreme Court repeatedly has recognized that "cutting prices in order to increase business often is the very essence of competition," *Matsushita,* 475 U.S. at 594, 106 S.Ct. at 1360. *See also Brook Group Ltd. v. Brown & Williamson Tobacco Corp.,* — U.S. ——, ——, 113 S.Ct. 2578, 2586, 125 L.Ed.2d 168 (1993) ("... Congress did not intend to outlaw price differences that result from or further the forces of competition.");

*Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 341, 110 S.Ct. 1884, 1893, 109 L.Ed.2d 333 (1990) (" 'It is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition.' ") (citations omitted). There was little basis for believing that Welch was engaged in below-cost pricing as opposed to mere price reduction, although even below-cost pricing is not automatically an antitrust violation if competition is not threatened. *See Brook Group,* — U.S. at ——, 113 S.Ct. at 2588. Where, in addition, a new product is able to deeply penetrate the market during the challenged price-cutting period, it is evident that competition is unharmed and "summary disposition of the case is appropriate," *id.* — U.S. at ——, 113 S.Ct. at 2589.

■ *Request for Discovery.* Plaintiffs suggest that their inability to respond with particularity to defendants' motion for summary judgment is attributable to the district court's refusal to lift a stay of discovery that had been imposed on the antitrust claims. The decision whether to allow discovery while a summary judgment motion is pending rests within the discretion of the district court, *Sheinkopf v. Stone,* 927 F.2d 1259, 1263 (1st Cir.1991), and "the party seeking additional time for discovery ... must show that the facts sought 'will, if obtained, suffice to engender an issue both genuine and material,' " *id.* (citation omitted).

■ As the district court observed, plaintiffs were well situated to explore Welch's impact on competition in the bottled grape juice market, and they had an obligation to use their knowledge and connection with the market to develop some basis to justify further inquiry.[10] Plaintiffs, however, "never articulated how discovery from Welch would provide insight on the impact of Welch's conduct on the market." District Court Opinion, at 23–24. Their failure to do so negates their claim that the district court erred in denying discovery.

---

**9.** We have not considered Magna's argument that the § 1 claim fails because the requirement for joint action by *independent* entities is not fulfilled here in light of Magna's and Welch's unified economic interest. The argument does seem to have some force, however. *See Copperweld,* 467 U.S. at 776, 104 S.Ct. at 2744 (holding that "the coordinated behavior of a parent and

its wholly owned subsidiary falls outside the reach of [§ 1]"); *Pink Supply Corp. v. Hiebert, Inc.,* 788 F.2d 1313, 1316–17 (8th Cir.1986) (corporate agents may lack "the independent economic consciousness" necessary to be conspirators separate from their principal).

**10.** For example, plaintiffs could have done a sampling of stores to compare prices and shelf

Accordingly, we conclude that the district court properly dismissed plaintiffs' claims under sections 1 and 2 of the Sherman Act, as well as under the analogous provisions of Puerto Rico law.

### IV. *Conclusion*

For the foregoing reasons, we vacate the summary judgment for defendants on the Law 75 and tortious interference claims, and remand those issues for further proceedings consistent with this opinion. We affirm dismissal of the antitrust claims. We have not considered in any fashion defendants' argument to the district court that dismissal of all claims alternatively is appropriate based on Fed.R.Civ.P. 41 and the court's inherent powers to control the proceedings before it. The district court explicitly sidestepped this issue, and it is not properly before us.

*Affirmed in part, and vacated and remanded in part. Each party to bear its own costs.*

life between the Welch and Donald Duck products. If bottles of Donald Duck juice remained on the shelves for long periods while Welch products enjoyed a quick turnover, and Welch's prices were substantially lower, plaintiffs may have been able to persuade the district court to grant discovery into the possibility that Welch was engaged in predatory pricing. *See Brook Group,* —— U.S. at ——, 113 S.Ct. at 2587 (predatory pricing involves pricing products "in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market").