<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 UNITED STATES COURT OF APPEALS
                     FOR THE FIRST CIRCUIT
                      ____________________

No. 97-1802

           EUROMOTION, INC. d/b/a PRIME WHOLESALERS,

                     Plaintiff, Appellant,

                               v.

                  BMW OF NORTH AMERICA, INC.,

                      Defendant, Appellee.

                      ____________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

       [Hon. Juan M. Perez-Gimenez, U.S. District Judge]

                      ____________________

                             Before

                     Boudin, Circuit Judge,

          Campbell and Bownes, Senior Circuit Judges.

                                 
                      ____________________

    Rafael Escalera-Rodriguez, with whom Edna Hernandez and
Richard & Escalera, were on brief for appellant.
    Manuel A. Guzman, with whom Carlos A. Steffens and Manuel A.
Guzman Law Offices, were on brief for appellee.

                      ____________________

                       February 23, 1998
                      ____________________
     

          CAMPBELL, Senior Circuit Judge.  Euromotion, Inc.
   ("Euromotion") brought this diversity action against BMW of
   North America, Inc. ("BMW"), alleging that BMW had terminated
   Euromotion's dealership agreement without good cause in
   violation of Puerto Rico's Law 75 of June 24, 1964, P.R. Laws
   Ann. tit. 10,  278 et seq. ("Law 75"), and that BMW had failed
   to negotiate with Euromotion in good faith concerning a
   dealership, thereby violating Article 1802 of the Puerto Rico
   Civil Code, P.R. Laws Ann. tit. 31,  5141.  BMW moved for
   summary judgment arguing, inter alia, that the undisputed facts
   established that Euromotion had never been a BMW dealer, and
   that BMW had never in fact negotiated with Euromotion.  The
   district court granted BMW's motion.  We affirm the district
   court's grant of summary judgment.
                           I. BACKGROUND.
            We state the facts in the light most favorable to
   Euromotion.  See Casas Office Machs., Inc. v. Mita Copystar
   Am., Inc., 42 F.3d 668, 684 (1st Cir. 1994).   
            Beginning in 1991, Euromotion, an independent vendor
   of automobiles, without encouragement from BMW, began to
   perform many of the functions of a BMW dealer in Puerto Rico.  
   It bought BMW automobiles from independent dealers in Florida
   for resale in Puerto Rico, maintained an extensive BMW
   inventory, acquired sales facilities, and advertised having BMW
   automobiles for sale.
            BMW had no authorized dealer of its own in Puerto
   Rico, and in 1993 began to search for an establishment to serve
   as its exclusive dealer there.  Euromotion's president
   corresponded with BMW about Euromotion's expressed desire to
   become the exclusive BMW dealer in Puerto Rico.  In October
   1993, BMW interviewed Euromotion's president and other
   potential candidates for the dealership position.
            Around the same time, BMW instituted an export
   prohibition on its automobiles.  As a result of that
   prohibition, Tom Bush BMW, an independent BMW dealer in
   Florida, informed BMW and Euromotion that it would not continue
   to sell cars to Euromotion.
            Sometime in October or November of 1993, John
   Ciontea, the area manager for BMW, met with Manuel Soltero,
   Euromotion's president (the "1993 meeting").  Also present at
   this meeting were Luis Rios, an automobile dealer used by
   Euromotion, and Carlos Kirigin, a sales representative for a
   Florida BMW dealership by the name of Fields BMW.  At this
   meeting, Soltero expressed concern that BMW's newly implemented
   prohibition on exports would impede Euromotion's ability to
   obtain BMW's cars.  In response, Ciontea gave Kirigin (and
   through him, Fields BMW) the "green light" to sell cars and
   other paraphernalia to Euromotion.  According to Euromotion,
   BMW encouraged it to develop the Puerto Rican market and to
   keep its inventories high.  BMW also told Euromotion's
   president not to worry about the lack of a written dealer
   application packet because "everything would be put [i]n black
   and white" eventually.
            Euromotion contends that the 1993 meeting established
   a dealer relationship with BMW.  After the meeting, Euromotion
   sold only BMW's cars and attempted to develop the Puerto Rican
   market for such cars.  Euromotion obtained these cars from
   Fields BMW in Florida at a wholesale price.  Although it is
   clear from the record that BMW did not have the authority to
   impose any terms or conditions on Fields BMW regarding its sale
   of automobiles to Euromotion, and although these sales were
   negotiated between Fields BMW and Euromotion, Fields BMW would
   have charged Euromotion a higher price if the 1993 meeting had
   not taken place.  Euromotion also obtained brochures, T-shirts,
   and other BMW-related advertising materials from Fields BMW.  
   Further, the BMW-authorized service representative in Puerto
   Rico gave full warranty service to cars sold by Euromotion.
            The parties agree that Euromotion never bought a car
   directly from BMW, never placed a purchase order with BMW,
   never received any promotional material directly from BMW,
   never consulted or negotiated directly with BMW the prices or
   terms of its sales relationships with any of BMW's independent
   dealers, and never saw a copy of BMW's dealership agreement.
            On December 13, 1993, Soltero acknowledged in a
   letter written to BMW that BMW had "a lot of candidates for the
   [BMW dealership] franchise . . . [that] I understand you have
   to evaluate."  Soltero expressed the "hope that before [BMW
   picked its] candidate [it] should come to Puerto Rico and give
   [Euromotion] a chance to show our business, meet our great
   staff and finally demonstrate why we are the best choice to
   proudly represent the BMW franchise in Puerto Rico."  Soltero
   also asked BMW to "always remember that [Euromotion] already
   control[s] the BMW market and everybody recognize[s] us as the
   BMW dealer in Puerto Rico."
            On June 22, 1995, BMW announced in the Puerto Rican
   papers that it had chosen a company called "Autogermana" to
   serve as the exclusive BMW dealer for Puerto Rico.  Sometime
   after Autogermana was appointed as BMW's authorized dealer in
   Puerto Rico, Fields BMW ceased to give Euromotion the benefit
   of advantageous prices and business terms.
            On June 25, 1996, Euromotion filed the present action
   alleging that BMW had violated Law 75 and the duty of good
   faith and fair dealing imposed by Article 1802 of the Puerto
   Rican Civil Code.  Thereafter, Euromotion filed a motion for
   preliminary injunctive relief under Law 75, which the court
   denied after discovery and a hearing.  On October 24, 1996, BMW
   filed a motion for summary judgment on both of Euromotion's
   claims.
            On May 21, 1997, the district court allowed BMW's
   summary judgment motion.  On the Law 75 claim, the district
   court found that Soltero's letter of December 13, 1993, wherein
   he acknowledged that there were many contenders for BMW to
   evaluate for a possible Puerto Rican dealership, established
   conclusively that an actual dealer relationship did not then
   exist as a result of the prior meeting between Ciontea and
   Soltero.  On the good faith claim, the court found that none of
   the interactions between BMW and Euromotion constituted
   negotiations.  Since no negotiations took place, the court
   reasoned that BMW was not under a duty to negotiate in good
   faith.  The court did not address BMW's statute-of-limitations
   defense.  On May 22, 1997, the court dismissed the case with
   prejudice.  Euromotion has appealed.  We affirm.
                      II. STANDARD OF REVIEW.
            We review a grant of summary judgment de novo,
   viewing "the entire record in the light most hospitable to the
   party opposing summary judgment, indulging all reasonable
   inferences in that party's favor."  Griggs-Ryan v. Smith, 904
   F.2d 112, 115 (1st Cir. 1990) (citations omitted).  Summary
   judgment is appropriate only if "the pleadings, depositions,
   answers to interrogatories, and admissions on file, together
   with the affidavits, if any, show that there is no genuine
   issue as to any material fact and that the moving party is
   entitled to judgment as a matter of law."  Fed. R. Civ. P.
   56(c).     
            Summary judgment is properly awarded against a party
   who, "after adequate time for discovery . . . fails to make a
   showing sufficient to establish the existence of an element
   essential to that party's case, and on which that party will
   bear the burden of proof at trial."  Celotex Corp. v. Catrett,
   477 U.S. 317, 322 (1986).  Not all disputes preclude summary
   judgment, only those that relate to genuine issues of material
   fact.  "The evidence manifesting the dispute must be
   'substantial,' going beyond the allegations of the complaint."  
   Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975) (citations
   omitted).  Further, "neither conclusory allegations, improbable
   inferences, and unsupported speculation, nor [b]rash  
   conjecture coupled with earnest hope that something concrete
   will materialize" prevent us from awarding summary judgment.  
   J. Geils Employee Benefit Plan v. Smith Barney Shearson,
   Inc., 76 F.3d 1245, 1251 (1st Cir. 1996) (internal quotation
   marks and citations omitted).  Rather, to prevail over a
   properly supported motion for summary judgment, a nonmoving
   party must establish the existence of a trial-worthy issue by
   presenting "enough competent evidence to enable a finding
   favorable to the nonmoving party."  Goldman v. First Nat'l Bank
   of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Andersonv. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).
                          III. DISCUSSION.
   A.  The Law 75 Claim.
            Law 75 prohibits a principal from terminating its
   business relationship with a dealer unless the principal has
 "just cause."    P.R. Laws Ann. tit. 10,  278a.  We interpret
   the language of Law 75 "in the light of the ends sought by the
   statute," see Sudouest Import Sales Corp. v. Union Carbide
   Corp., 732 F.2d 14, 16 (1st Cir. 1984), which are "to protect
   Puerto Rico dealers from the harm caused when a supplier
   arbitrarily terminates a distributorship once the dealer has
   created a favorable market for the supplier's products, 'thus
   frustrating the legitimate expectations and interests of those
   who so efficiently carried out their responsibilities,'"  R.W.
   Int'l Corp. v. Welch Food, Inc., 13 F.3d 478, 482 (1st Cir.
   1994) (citing Medina & Medina v. Country Pride Foods, Ltd., 858
   F.2d 817, 820 (1st Cir. 1988)).
            To that end, Law 75 is drafted in broad terms.  Law
   75 defines a dealer as a "person actually interested in a
   dealer's contract."  P.R. Laws Ann. tit. 10,  278(a).  A
   "dealer's contract" includes any business relationship
       established between a dealer and a principal or grantor
       whereby and irrespectively of the manner in which the
       parties may call, characterize or execute such
       relationship, the former actually and effectively takes
       charge of the distribution of a merchandise, or the
       rendering of a service, by concession or franchise, on the
       market of Puerto Rico.
   P.R. Laws Ann. tit. 10,  278(b).
            Euromotion argues that it succeeded in raising an
   issue of material fact regarding whether the 1993 meeting
   created a dealer-principal relationship.  Euromotion analogizes
   its relationship with BMW (through Fields BMW) to the dealer
   relationship in a case decided by the Puerto Rican Supreme
   Court, J. Soler Motors, Inc. v. Kaiser Jeep International
   Corp., 8 P.R. Offic. Trans. 138, 108 D.P.R. 134 (1978).  In J.
   Soler Motors, the defendant appointed the plaintiff as its
   dealer in Puerto Rico, then assigned the dealership contract to
   its general distributor in the area.  See id. at 141.  This
   meant that the dealer had to place orders for cars and parts
   through the general distributor.  See id.  Despite the presence
   of this intermediary, the court applied Law 75 to cover the
   dealer.  See id. at 145.
            We are not persuaded.  In J. Soler Motors, the
   plaintiff had signed a dealership contract setting out detailed
   terms to govern its business relationship with the defendant.  
   No such evidence appears in the present case.  Euromotion
   admits that it never even saw the standard dealership agreement
   routinely used by BMW much less became a party to such a
   contract.
            Perhaps sensing the weakness in its argument,
   Euromotion notes that we have defined the necessary dealer
   relationship for Law 75 purposes quite generously.  We have
   held that a party still in the process of negotiating the final
   terms of a dealer's contract may fall under the protective
   aegis of Law 75 where, for some time, it had been acting de
   facto as a dealer.  See Welch, 13 F.3d at 486.
            But Welch was an altogether different case.  The
   defendant in Welch had written to the plaintiff stating that it
   had "reached a decision to continue the frozen food
   distribution . . . in Puerto Rico by transferring [its] account
   to [the plaintiff]."  Id. at 480.  In that same letter, the
   defendant agreed to "draft an agreement" that would establish
   the plaintiff as an authorized dealer.  Id.  Shortly
   afterwards, while still in the process of negotiating the terms
   of a written dealership agreement, the parties began doing
   business directly with one another as if a dealer relationship
   had already been formalized.
            The defendant in Welch conceded that the plaintiff
   was "performing the functions of a distributor within the
   meaning of Law 75."  Id. at 482.  In the circumstances, we
   stated that Law 75 "clearly incorporates within its reach any
   arrangement between a supplier and dealer in which the dealer
   is actually in the process of distributing the suppliers'
   merchandise in Puerto Rico."  Id. at 482-83.
            Focusing only on the last statement quoted above,
   Euromotion argues that whenever "parties are dealing, a
   dealership exists for purposes of the Act," quoting Welch, 13
   F.3d at 484.  We made that statement, however, in a context
   very different from that at bar.  First, Euromotion never
   reached the point here of becoming engaged in negotiations with
   BMW regarding the terms of an actual dealership contract.  
   Second, there is no substantial evidence that BMW ever
   designated Euromotion, even informally, to act as its
   authorized dealer as distinct from continuing to sell BMW cars
   independently.  Third, the parties in Welch directly dealt with
   one another for over a year in the manner of a de facto
   dealership arrangement.  Although the lack of direct dealings
   may not always be determinative, see J. Soler Motors, 8 P.R.
   Offic. Trans. at 145, direct business relations as in Welch can
   provide evidence of a dealer relationship.  Fourth,
   Euromotion's president wrote a letter to BMW after the dealer
   relationship was supposedly established in which he
   acknowledged that BMW had "a lot of candidates for the [BMW
   dealership] franchise . . . [that] I understand you have to
   evaluate."  This letter is clearly inconsistent with
   Euromotion's position that it had an understanding with BMW
   that it was BMW's authorized dealer.  Welch, therefore, is in
   no sense dispositive.
            Euromotion also argues that Law 75 allows recovery by
   any dealer, such as itself, who "invest[s] time, effort, and
   expense in the development of a market, . . . even where
   certain other trappings of the typical dealership [are]
   missing."  Sudouest Import Sales Corp., 732 F.2d at 16
   (citation omitted).  However, unilateral efforts to sell a
   product and develop a market are not sufficient, alone, to
   create a dealer relationship within the purview of Law 75.  SeeLneas Areas Costarricenses v. Caribbean Gen., Inc., 682 F.
   Supp. 117, 121 (D.P.R. 1988) (collecting cases).
            It is true that there is evidence that BMW encouraged
   its independent dealer in Florida, Fields BMW, to continue its
   favorable business relationship with Euromotion.  At that time,
   BMW may well have been pleased, and so expressed itself, by
   Euromotion's efforts to sell BMW automobiles in Puerto Rico.  
   However, BMW's encouragement of Euromotion to proceed at that
   time as an independent seller of BMW automobiles could not
   create a dealer relationship.
            On this record, the only conclusion a reasonable fact
   finder could reach is that Euromotion did not have a dealer
   relationship within Law 75 with BMW.  The absence of such a
   relationship is fatal to its claim.  See Welch, 13 F.3d at 483
   (declaring that Law 75 "insists upon establishment of a
   'supplier/dealer' relationship").  Accordingly, the district
   court correctly dismissed Euromotion's Law 75 claim.
   B.  Duty to Negotiate in Good Faith.
            The Puerto Rican Supreme Court has held that,
   although parties generally may withdraw from negotiations at
   any time prior to forming a contract, parties once engaged in
 a negotiation process have a duty to proceed in good faith.    
   See Producciones Tommy Muiz, Inc. v. COPAN, 13 P.R. Offic.
   Trans. 660, 676, 113 P.R. Dec. 517 (1982).  Euromotion charges
   that BMW violated that duty.  The district court did not
   explore the question whether BMW had terminated negotiations
   with Euromotion in bad faith because it found that Euromotion
   had failed to demonstrate that Euromotion and BMW ever reached
   the point of becoming involved in contract negotiations.   
            Euromotion asserts that it is "indisputable" in light
   of the evidence that the court, in reaching its conclusion,
   improperly weighed the credibility of the witnesses.  Since our
   review is de novo, see Griggs-Ryan, 904 F.2d at 115, we need
   not consider whether the specific reasoning set out by the
   district court contained errors.  Rather, we ask whether the
   evidence presented by Euromotion was adequate to establish that
   negotiations sufficient to be regarded as such ever took place
   between the parties.  Cf. Celotex Corp., 477 U.S. at 322
   (stating that, in order to avoid a properly supported motion
   for summary judgment, a nonmoving party must make a "showing
   sufficient to establish the existence of an element essential
   to that party's case, and on which that party will bear the
   burden of proof at trial").  We find Euromotion's evidence
   insufficient to establish that a course of negotiations looking
   to the creation of a dealer's contract ever occurred.  We
   therefore affirm the district court.
            According to Euromotion, the following facts
   constituted negotiations between itself and BMW.  First,
   Euromotion's president was interviewed by BMW, along with other
   candidates, to determine whether to select Euromotion for the
   position of dealer.  Second, BMW encouraged Euromotion in 1993
   to continue to sell BMW automobiles, as it was then doing, and
   develop a market in Puerto Rico.  Third, BMW urged Fields BMW
   at that time to aid Euromotion in developing the Puerto Rican
   market, as it had been doing for a while.  Fourth, because
   Euromotion's president believed that Euromotion was being
   considered as a candidate for the Puerto Rican dealership,
   Euromotion took action to create a larger market for BMW's cars
   in Puerto Rico.  Fifth, Euromotion kept BMW informed of its
   progress.
            None of the above, in our view, were negotiations
   such as might trigger the duty of good faith in the Puerto
   Rican Civil Code.  Rather they were preliminary activities and
   dealings reflecting, among other things, a modicum of initial
   interest by BMW in Euromotion's activities as an independent
   salesman of BMW vehicles, and also reflecting Euromotion's
   intense but unsuccessful efforts to become a finalist for the
   dealership position.  While BMW encouraged Euromotion to
   proceed with its independent sales of BMW cars and interviewed
   Euromotion's president along with others, BMW never selected
   Euromotion as someone with whom it intended to negotiate a
   dealership contract.  And, in fact, no contract negotiations
   ever took place.  None of the interactions between the parties
   addressed the concerns that parties looking to form a dealer
   relationship would address.  BMW and Euromotion did not discuss
   inventory requirements, sales goals, promotional allowances,
   showroom standards, trademark use, minimum service facilities,
   warranty conditions, payment and credit arrangements, letters
   of credit, or personnel and staffing requirements.  Further,
   the record establishes that Euromotion never submitted the
   required dealer application to BMW and never saw the BMW
   authorized dealer standard agreement.  Lastly, Euromotion's
   letter to BMW in December of 1993 confirms that Euromotion
   understood itself to be just one candidate among several.  The
   district court concluded that: "None of this [evidence
   presented by Euromotion] constitutes contract 'negotiations' by
   any stretch of the imagination."  We agree.   
            It is true, of course, that "when the facts support
   plausible but conflicting inferences on a pivotal issue in the
   case, the judge may not choose between those inferences at the
   summary judgment stage."  Coyne v. Taber Partners I, 53 F.3d
   454, 460 (1st Cir. 1995); see also Anderson, 477 U.S. at 249
   (noting that a judge should not weigh the evidence when
   considering a motion for summary judgment).  Still, a court
   should not indulge a nonmoving party's inferences if they do
   not "flow rationally from the underlying facts."  Rubinovitz v.
   Rogato, 60 F.3d 906, 911 (1st Cir. 1995).  On the facts of this
   case viewed in the light most favorable to Euromotion, no
   reasonable fact finder could conclude that BMW entered into
   negotiations with Euromotion concerning the formation of a
   dealership contract.  It follows that BMW's refusal, for
   whatever reason, to talk further with Euromotion could not
   amount to a breach of Puerto Rico's doctrine requiring parties
   who enter into contract negotiations to proceed in good faith.  
   We hold that summary judgment was appropriate on Euromotion's
   good faith claim.
            Affirmed.

</body>

</html>