USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  ____________________ No. 95-2177 R. W. INTERNATIONAL CORP. AND T. H. WARD DE LA CRUZ, INC., Appellants, v. WELCH FOODS, INC., Appellee.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Gilberto Gierbolini-Ortiz, Senior U.S. District Judge] __________________________  ____________________ Before Cyr, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________  ____________________ Jos A. Hern ndez Mayoral for appellants. _________________________ Gilberto J. Marxuach-Torr s, with whom Samuel T. C spedes, Ana ___________________________ __________________ ___ Matilde Nin, and McConnell Valdes were on brief for appellee. ___________ ________________  ____________________ July 10, 1996  ____________________ CYR, Circuit Judge. R.W. International Corp. and T.H. CYR, Circuit Judge.  _______ _____ Ward de la Cruz, Inc. (collectively: "R.W.") appeal a summary judgment dismissing their claim that Welch Foods, Inc. ("Welch") unilaterally terminated its dealership contract with R.W. in violation of the Puerto Rico Dealers' Contracts Act, P.R. Laws Ann. tit. 10, 278 ("Law 75"). We affirm the district court judgment. BACKGROUND1 BACKGROUND __________ Welch is a major fruit juice manufacturer which has sold its products in Puerto Rico since the 1930's through various local distributors. On March 25, 1988, Welch designated R.W. as its new Puerto Rico distributor for frozen juice concentrate. While the parties continued to negotiate the terms of a final dealership contract, R.W. began distributing Welch products to over 500 retail stores throughout Puerto Rico.  Prior to R.W.'s designation as its distributor, Welch had expressed concern about R.W.'s insistence on continuing to distribute "Donald Duck" frozen juice concentrate, a competing brand, and on its plans to begin distribution of "Donald Duck" bottled juice products in January 1989. Consequently, R.W. had agreed, in principle, to take various measures designed to alleviate Welch's concerns, including a one-year trial dealership  ____________________ 1The facts are stated in the light most favorable to appel- lant R.W. The reader is referred to our two earlier decisions for additional detail. See R.W. Int'l Corp. v. Welch Food, Inc., ___ ________________ ________________ 13 F.3d 478 (1st Cir. 1994); R.W. Int'l Corp., 937 F.2d 11 (1st ________________ Cir. 1991).  2 during which R.W. would give Welch's frozen juice product full marketing priority and support, increase Welch's sales by 15% over 1987 sales figures, and contribute $50,000 toward a joint advertising promotion of Welch's juice products. Notwithstanding their agreement in principle, final contract negotiations between the parties immediately and unexpectedly became contentious in several peripheral respects which remained unresolved for more than a year.2  In January 1989, after R.W. began its long-planned expansion of the "Donald Duck" distribution line to include both frozen and bottled juices, Welch employees noticed that (i) R.W. had included an advertisement for Donald Duck frozen juice in a supermarket "shopper" publication, while omitting an advertise- ment for Welch frozen juice; (ii) "on various occasions" R.W. had _____ stocked Welch frozen juice on the bottom shelves of retail store _____ freezer cases, while placing Donald Duck frozen juice at customer eye-level; and (iii) R.W.'s average monthly sales figures for Welch products during January-February 1989 fell by approximately 14% from its average monthly sales figures for 1988.3   ____________________ 2The matters in contention included whether: R.W. would be Welch's exclusive Puerto Rico dealer during the one-year trial period; New York or Puerto Rico law would govern any contract dispute; R.W. would "assume" the "grandfathered" contract of Welch's previous dealer, thereby avoiding application of Law 75. 3During the one-year dealership relationship, Welch juice sales were as follows: April 1988 1900 cases $ 42,770 May 1988 3060 cases $ 70,354 June 1988 2983 cases $ 63,971 July 1988 3005 cases $ 64,056 3 On March 30, 1989, Welch discontinued the yearlong contract negotiations and unilaterally terminated R.W.'s dealer- ship. Welch pointed to the "conflicts of interest of [R.W.] representing both competing lines [i.e., Welch and Donald Duck], [which] are significant and irreconcilable, [and] [a]n increased level of conflict in personal relations between [us]." In April 1989, R.W. filed this action alleging that Welch's unilateral termination of the dealership violated Law 75, which provides:  Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the exist- ing relationship, no principal or grantor may directly or indirectly perform any act detri- mental [i.e., unilateral termination] to the established relationship or refuse to renew said contract on its normal expiration, ex- ___ cept for just cause. ____ ___ ____ _____ P.R. Laws Ann. tit. 10, 278a (1976 and Supp. 1989) (emphasis added). The district court initially entered summary judgment for Welch on the ground that Law 75 afforded no protection to dealers unless a final, written "dealer's contract" has been executed by the parties. On remand following our vacation of the  ____________________ August 1988 3093 cases $ 66,983 September 1988 2607 cases $ 54,809 October 1988 2866 cases $ 61,022 November 1988 2312 cases $ 49,619 December 1988 2587 cases $ 55,220 January 1989 2471 cases $ 52,189 February 1989 2284 cases $ 48,687 March 1989 2955 cases $ 72,640 Although R.W. notes that sales figures rebounded in March 1989, Welch made its determination to terminate contract negotiations before month-end. 4 district court judgment, see R.W. Int'l, 13 F.3d at 486 (holding ___ __________ that the broad definition of "dealer's contract" in Law 75 would comprehend dealers actually engaging in product distribution for a principal, albeit only through a course of dealing preceding ______ the execution of a final contract), Welch renewed its motion for summary judgment. It contended that the undisputed evidence established that R.W.'s demonstrated conflict of interest consti- tuted "just cause," under Law 75, for terminating their one-year dealership. The district court once again entered summary judgment for Welch and R.W. appealed. DISCUSSION4 DISCUSSION __________ The Puerto Rico Legislature enacted Law 75 believing that traditional contract-law principles had not afforded local dealers adequate protection from arbitrary dealer-contract terminations by larger, primarily mainland-based principals which normally enjoy a superior bargaining position. See Vulcan Tools ___ ____________ of P.R. v. Makita U.S.A., Inc., 23 F.3d 564, 568 (1st Cir. _______ ____________________ 1994).5 The Legislature therefore prohibited a principal from  ____________________ 4We will uphold a grant of summary judgment if the competent evidence discloses no genuine issue of material fact and Welch is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; ___ Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d __________________________ ________________________ 668, 678 (1st Cir. 1994). The materiality of any disputed fact in genuine dispute is determined through reference to the appli- cable substantive law, in this case, Law 75. See Anderson v. ___ ________ Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). ___________________ 5The statement of motives in Law 75 reads, in pertinent part: "The Commonwealth of Puerto Rico cannot remain indifferent to the growing number of cases in which domestic and foreign enterprises, without just cause, eliminate their dealers, conces- sionaires or agents, as soon as these have created a favorable 5 unilaterally terminating an established dealership "except for just cause." See P.R. Laws Ann. tit. 10, 278a. Law 75 defines ___ "just cause" as either "nonperformance of any of the essential ______ obligations of the dealer's contract, on the part of the dealer, or any action or omission on [the dealer's] part that adversely __ and substantially affects the interest of the principal or grantor in promoting the marketing or distribution of the mer- chandise or service." Id. 278 (emphasis added).  __ Ultimately, "just cause" under Law 75 is a question of fact, see La Playa Santa Marina, Inc. v. Chris-Craft Corp., 597 ___ ____________________________ __________________ F.2d 1, 4 (1st Cir. 1979), as are the subsidiary issues (i) whether the contracting parties considered the particular con- tract obligation allegedly breached by the dealer to be "essen- tial," see Biomedical Instrument and Equip. Corp. v. Cordis ___ _________________________________________ ______ Corp., 797 F.2d 16, 18 (1st Cir. 1986), see also PPM Chem. Corp. _____ ___ ____ _______________ of P.R. v. Saskatoon Chem., Ltd., 931 F.2d 138, 140 (1st Cir. _______ ______________________ 1991), or (ii) whether any other "non-breaching" acts or omis- sions by the dealer were nonetheless sufficiently egregious to have "adversely and substantially affect[ed] the interest of the principal or grantor in promoting the marketing or distribution of the merchandise or service," Pan Am. Computer Corp. v. Data ______________________ ____ Gen. Corp., 652 F.2d 215, 217 n.2 (1st Cir. 1981); La Playa, 597 __________ ________ F.2d at 3 (upholding final judgment for dealer, despite its two "minor" contract breaches). Moreover, once a dealer demonstrates  ____________________ market and without taking into account their legitimate inter- ests."  6 that its principal unilaterally terminated their contract, the principal must carry the burden of persuasion on the factual elements of the "just cause" showing. Newell Puerto Rico, Ltd. _________________________ v. Rubbermaid Inc., 20 F.3d 15, 22 (1st Cir. 1994); La Playa, 597 _______________ ________ F.2d at 3-4. R.W. does not contest the historical facts upon which Welch based its claim that R.W. operated under a conflict of interest adverse to Welch's long-term interests: R.W.'s lower sales of Welch products during January-February 1989, see supra ___ _____ note 3; R.W.'s failure to include a Welch sales promotion in an issue of a supermarket "shopper" which carried an advertisement for Donald Duck's competing products; and its "occasional" placement of Welch products in freezer positions less favorable and less consumer-friendly than the Donald Duck products. Rather, R.W. merely argues that divergent inferences might be drawn from these undisputed facts, bearing on the issues of "essentiality" and "adversity" upon which Welch would be required to bear the burden of proof at trial, and that these competing inferences generated trialworthy issues not amenable to summary judgment.6 Even conceding the reasonableness of any such competing inferences, however, R.W.'s protestation that it committed no  ____________________ 6For example, the parties dispute whether their mutual "contractual" commitment to contribute $50,000 apiece to adver- tise Welch frozen concentrate was to be performed during the one- year trial period following R.W.'s March 1988 designation, or whether this commitment would accrue only during a one-year trial period commencing from the date a final written dealership contract was signed.  7 cognizable breach of "contract," or other act or omission suffi- ciently "adverse" to Welch's business interests to warrant termination, would not preclude summary judgment for Welch. Although Law 75, by its plain terms, makes the "just cause" inquiry turn solely on the dealer's actions or omissions, see ________ ___ P.R. Laws Ann. tit. 10, 278, the Puerto Rico Supreme Court has read a "third" "just cause" into the statute to avoid constitu- tional invalidation, by holding that a principal's own circum- stances may permit its unilateral termination of an ongoing dealership, irrespective of the dealer's conduct. See Medina & ___ ________ Medina v. Country Pride Foods, Ltd., 858 F.2d 817, 822-23 (1st ______ __________________________ Cir. 1988) (responding to question certified in 825 F.2d 1 (1st Cir. 1987)).  After the principal in Medina unsuccessfully attempted ______ in protracted good-faith negotiations to adjust its business to changed market conditions by renegotiating price and credit terms with its long-time dealer, it decided to terminate the dealer's contract, and withdraw from the Puerto Rico market. Id. at 818- ___ 19. The Medina court noted that an overly restrictive interpre- ______ tation of Law 75's "just cause" requirement could place a princi- pal in a serious dilemma under such circumstances: either capitulate to the dealer's price and credit terms and be held hostage in an interminable dealership relationship on disadvanta- geous terms, or unilaterally terminate the contract and expose itself to a costly lawsuit under Law 75. Id. at 822 & n.4. ___ Where the principal intends to retire entirely from the Puerto 8 Rico market, however, little if any danger exists that the sort of exploitation proscribed by Law 75 can occur, since the retir- ing principal cannot hope to appropriate prospectively the product goodwill created by its dealer in the Puerto Rico market. Id. at 823. Thus, where the principal offers "reasonable" ___ contract terms, but nonetheless arrives at a bona fide impasse in ____ ____ the negotiations, barring unusual circumstances not present here Medina ordains a determination that there was "just cause" for ______ the unilateral dealership termination by the principal. See id.; ___ ___ see also Borg Warner Int'l Corp. v. Quasar Co., No. CE-94-182, ___ ____ ________________________ ___________ slip op. at 10 n.8 (P.R. Mar. 14, 1996) (Official Translation). "Absent controlling state court precedent, a federal court sitting in diversity may . . . predict[] . . . the course the state courts would take [if] reasonably clear." VanHaaren v. _________ State Farm Mut. Auto. Ins. Co., 989 F.2d 1, 3 (1st Cir. 1993). _______________________________ In fact, this court predicted earlier that upon remand and further discovery Welch's asserted reasons for terminating R.W. might constitute "just cause" as enunciated in Medina:  ______ [W]e fail to see how applying Law 75 in the circumstances of this case necessarily would require Welch to continue a relationship it does not want in a manner to which it has serious objections. Law 75 simply requires a supplier to justify its decision to terminate a dealership. If Welch's con- flict-of-interest concerns about R.W. are legitimate, we have no doubt that this would constitute "just cause" under Law 75. . . . Medina & Medina is not precisely on point _________________ because it involved a supplier's decision to totally withdraw from the Puerto Rico market following good-faith negotiations that failed to achieve agreement between the parties. There is no indication here that Welch in- 9 tended to leave the market rather than find a new dealer. Nevertheless, we believe the principle underlying Medina & Medina is e- ________________ qually applicable in these circumstances, i.e., that a supplier has just cause to ter- _ ________ ___ ____ _____ __ ____ minate if it has bargained in good faith but ______ __ __ ___ _________ __ ____ _____ ___ has not been able "to reach an agreement as ___ ___ ____ ____ __ _____ __ _________ __ to price, credit, or some other essential __ _____ ______ __ ____ _____ _________ element of the dealership." This would be _______ __ ___ __________ true at least where, as here, the supplier's market in Puerto Rico was well established before the current dealer relationship and the supplier's action therefore "is not aimed at reaping the good will or clientele estab- lished by the dealer."  R.W. Int'l Corp., 13 F.3d at 484 & n.4 (emphasis added).  ________________ Our discussion did not suggest that the "good faith" inquiry necessarily would be amenable to summary judgment, of course. Nonetheless, whereas the ultimate burden to prove "just cause" under the two-part statutory definition resides with the _________ principal (i.e., Welch), see Newell, 20 F.3d at 22, the bona ___ ______ ____ fides of contract negotiations must be presumed under Puerto Rico _____ law. See Borg Warner, No. CE-94-182, slip op. at 10 n.8. ___ ____________ Consequently, at trial R.W. would bear the burden to establish Welch's bad faith for purposes of the Medina "just cause" deter- ______ mination.  R.W. has not met its burden as a nonmoving party under Fed. R. Civ. P. 56. See Celotex Corp. v. Catrett, 477 U.S. 317, ___ _____________ _______ 322 (1986) (if the nonmovant would bear the burden of proof on a particular issue at trial, its failure to adduce sufficient evidence to demonstrate its trialworthiness warrants summary judgment for the movant); Smith v. Stratus Computer, Inc., 40 _____ _______________________ F.3d 11, 12 (1st Cir. 1994), cert. denied, 115 S. Ct. 1958 _____ ______ 10 (1995). As R.W. proffered no competent evidence to rebut the historical facts relied on by Welch to justify its unilateral termination i.e., declining sales figures, the "shopper" omission, or the bottom-shelf freezer placements we need only ask whether a rational jury could find mala fides or unreason- ____ _____ ableness on the part of Welch in determining that R.W. was representing conflicting interests.  Even before R.W.'s March 1988 designation, Welch made clear that it appreciated R.W.'s distribution capabilities, but was extremely wary of its handling of Donald Duck frozen juice concentrate and of its plans to begin distributing Donald Duck bottled juice in January 1989. In order to get the Welch con- tract, Thomas Ward, R.W.'s president, agreed to the one-year trial period, the sales-volume commitments, and the mutual advertising expenditures. The parties understood that the one- year trial period would allow Welch to assess whether R.W. could distribute Donald Duck products while meeting its obligation to provide full marketing support for Welch products. In January 1989, however, there were strong signals that R.W. was shifting its primary attention to its newly expanded Donald Duck line, at Welch's expense. Although R.W. plausibly suggests that these indicia were either ambiguous, anecdotal, or aberrational, and that genuine factual issues may well remain as to whether these indicia signaled a "contract" breach or other sufficiently "adverse" action by R.W. under P.R. Laws Ann. tit. 10, 278, R.W. has not shown that it was unreasonable for Welch, acting in 11 presumed good faith, to interpret these signals as portending a troubled business relationship ahead, and to withdraw from it. Cf. Newell, 20 F.3d at 23 (upholding verdict for dealer because ___ ______ principal had known for twenty-three years that dealer had been marketing competing product). Given that Welch already had a fifty-year presence in the Puerto Rico market before appointing R.W. in 1988, and that the parties reached a bona fide impasse on ____ ____ an essential modification to the terms of their ongoing dealer's "contract" (i.e., whether R.W. would continue to handle competing product lines), we conclude that a rational jury could not find that Welch acted in "bad faith." Accordingly, summary judgment was proper. The judgment is affirmed. The judgment is affirmed. ________________________ 12