R.W. INTERNATIONAL CORP. and T.H. Ward de la Cruz, Inc., Appellants,

v.

WELCH FOODS, INC., Appellee.

No. 95–2177.

United States Court of Appeals, First Circuit.

Heard April 3, 1996.

Decided July 10, 1996.

**50**

José A. Hernández Mayoral, Hato Rey, PR, for appellants.

Gilberto J. Marxuach–Torrós, Hato Rey, PR, with whom Samuel T. Céspedes, Hato Rey, PR, Ana Matilde Nin, San Juan, PR, and McConnell Valdes, Hato Rey, PR, were on brief, for appellee.

Before CYR, Circuit Judge, CAMPBELL, Senior Circuit Judge, and BOUDIN, Circuit Judge.

CYR, Circuit Judge.

R.W. International Corp. and T.H. Ward de la Cruz, Inc. (collectively: "R.W.") appeal a summary judgment dismissing their claim that Welch Foods, Inc. ("Welch") unilaterally terminated its dealership contract with R.W. in violation of the Puerto Rico Dealers' Contracts Act, P.R. Laws Ann. tit. 10, § 278 ("Law 75"). We affirm the district court judgment.

### BACKGROUND [1]

Welch is a major fruit juice manufacturer which has sold its products in Puerto Rico since the 1930's through various local distributors. On March 25, 1988, Welch designated R.W. as its new Puerto Rico distributor for frozen juice concentrate. While the parties continued to negotiate the terms of a final dealership contract, R.W. began distributing Welch products to over 500 retail stores throughout Puerto Rico.

Prior to R.W.'s designation as its distributor, Welch had expressed concern about R.W.'s insistence on continuing to distribute "Donald Duck" frozen juice concentrate, a competing brand, and on its plans to begin distribution of "Donald Duck" bottled juice products in January 1989. Consequently, R.W. had agreed, in principle, to take various measures designed to alleviate Welch's concerns, including a one-year trial dealership during which R.W. would give Welch's frozen juice product full marketing priority and support, increase Welch's sales by 15% over 1987 sales figures, and contribute $50,000 toward a joint advertising promotion of Welch's juice products. Notwithstanding their agreement in principle, final contract negotiations between the parties immediately and unexpectedly became contentious in several peripheral respects which remained unresolved for more than a year.[2]

In January 1989, after R.W. began its long-planned expansion of the "Donald Duck" distribution line to include both frozen and bottled juices, Welch employees noticed that (i) R.W. had included an advertisement for Donald Duck frozen juice in a supermarket "shopper" publication, while omitting an advertisement for *Welch* frozen juice; (ii) "on various occasions" R.W. had stocked *Welch* frozen juice on the bottom shelves of retail store freezer cases, while placing Donald Duck frozen juice at customer eye-level; and (iii) R.W.'s average monthly sales figures for Welch products during January–February 1989 fell by approximately 14% from its average monthly sales figures for 1988.[3]

| | | |
|---|---|---|
| April 1988 | 1900 cases | $42,770 |
| May 1988 | 3060 cases | $70,354 |
| June 1988 | 2983 cases | $63,971 |
| July 1988 | 3005 cases | $64,056 |
| August 1988 | 3093 cases | $66,983 |
| September 1988 | 2607 cases | $54,809 |
| October 1988 | 2866 cases | $61,022 |
| November 1988 | 2312 cases | $49,619 |
| December 1988 | 2587 cases | $55,220 |
| January 1989 | 2471 cases | $52,189 |
| February 1989 | 2284 cases | $48,687 |
| March 1989 | 2955 cases | $72,640 |

Although R.W. notes that sales figures rebounded in March 1989, Welch made its determination to terminate contract negotiations before month-end.

---

1. The facts are stated in the light most favorable to appellant R.W. The reader is referred to our two earlier decisions for additional detail. *See R.W. Int'l Corp. v. Welch Food, Inc.,* 13 F.3d 478 (1st Cir.1994); *R.W. Int'l Corp. v. Welch Foods, Inc.,* 937 F.2d 11 (1st Cir.1991).

2. The matters in contention included whether: R.W. would be Welch's exclusive Puerto Rico dealer during the one-year trial period; New York or Puerto Rico law would govern any contract dispute; R.W. would "assume" the "grandfathered" contract of Welch's previous dealer, thereby avoiding application of Law 75.

3. During the one-year dealership relationship, Welch juice sales were as follows:

On March 30, 1989, Welch discontinued the yearlong contract negotiations and unilaterally terminated R.W.'s dealership. Welch pointed to the "conflicts of interest of [R.W.] representing both competing lines [i.e., Welch and Donald Duck], [which] are significant and irreconcilable, [and][a]n increased level of conflict in personal relations between [us]."

In April 1989, R.W. filed this action alleging that Welch's unilateral termination of the dealership violated Law 75, which provides:

> Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental [i.e., unilateral termination] to the established relationship or refuse to renew said contract on its normal expiration, *except for just cause.*

P.R. Laws Ann. tit. 10, § 278a (1976 and Supp.1989) (emphasis added). The district court initially entered summary judgment for Welch on the ground that Law 75 afforded no protection to dealers unless a final, written "dealer's contract" has been executed by the parties. On remand following our vacation of the district court judgment, *see R.W. Int'l*, 13 F.3d at 486 (holding that the broad definition of "dealer's contract" in Law 75 would comprehend dealers actually engaging in product distribution for a principal, *albeit* only through a course of dealing preceding the execution of a final contract), Welch renewed its motion for summary judgment. It contended that the undisputed evidence established that R.W.'s demonstrated conflict of interest constituted "just cause," under Law 75, for terminating their one-year dealership. The district court once again entered summary judgment for Welch and R.W. appealed.

## DISCUSSION [4]

The Puerto Rico Legislature enacted Law 75 believing that traditional contract-law principles had not afforded local dealers adequate protection from arbitrary dealer-contract terminations by larger, primarily mainland-based principals which normally enjoy a superior bargaining position. *See Vulcan Tools of P.R. v. Makita U.S.A., Inc.*, 23 F.3d 564, 568 (1st Cir.1994).[5] The Legislature therefore prohibited a principal from unilaterally terminating an established dealership "except for just cause." *See* P.R. Laws Ann. tit. 10, § 278a. Law 75 defines "just cause" as *either* "nonperformance of any of the essential obligations of the dealer's contract, on the part of the dealer, *or* any action or omission on [the dealer's] part that adversely and substantially affects the interest of the principal or grantor in promoting the marketing or distribution of the merchandise or service." *Id.* § 278 (emphasis added).

Ultimately, "just cause" under Law 75 is a question of fact, *see La Playa Santa Marina, Inc. v. Chris–Craft Corp.*, 597 F.2d 1, 4 (1st Cir.1979), as are the subsidiary issues (i) whether the contracting parties considered the particular contract obligation allegedly breached by the dealer to be "essential," *see Biomedical Instrument and Equip. Corp. v. Cordis Corp.*, 797 F.2d 16, 18 (1st Cir.1986), *see also PPM Chem. Corp. of P.R. v. Saskatoon Chem., Ltd.*, 931 F.2d 138, 140 (1st Cir.1991), or (ii) whether any other "non-breaching" acts or omissions by the dealer were nonetheless sufficiently egregious to have "adversely and substantially affect[ed] the interest of the principal or grantor in promoting the marketing or distri-

---

4. We will uphold a grant of summary judgment if the competent evidence discloses no genuine issue of material fact and Welch is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56; *Casas Office Machs., Inc. v. Mita Copystar Am., Inc.*, 42 F.3d 668, 678 (1st Cir.1994). The materiality of any disputed fact in genuine dispute is determined through reference to the applicable substantive law, in this case, Law 75. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

5. The statement of motives in Law 75 reads, in pertinent part: "The Commonwealth of Puerto Rico cannot remain indifferent to the growing number of cases in which domestic and foreign enterprises, without just cause, eliminate their dealers, concessionaires or agents, as soon as these have created a favorable market and without taking into account their legitimate interests."

bution of the merchandise or service," *Pan Am. Computer Corp. v. Data Gen. Corp.*, 652 F.2d 215, 217 n. 2 (1st Cir.1981); *La Playa*, 597 F.2d at 3 (upholding final judgment for dealer, despite its two "minor" contract breaches). Moreover, once a dealer demonstrates that its principal unilaterally terminated their contract, the principal must carry the burden of persuasion on the factual elements of the "just cause" showing. *Newell Puerto Rico, Ltd. v. Rubbermaid Inc.*, 20 F.3d 15, 22 (1st Cir.1994); *La Playa*, 597 F.2d at 3–4.

R.W. does not contest the historical facts upon which Welch based its claim that R.W. operated under a conflict of interest adverse to Welch's long-term interests: R.W.'s lower sales of Welch products during January–February 1989, *see supra* note 3; R.W.'s failure to include a Welch sales promotion in an issue of a supermarket "shopper" which carried an advertisement for Donald Duck's competing products; and its "occasional" placement of Welch products in freezer positions less favorable and less consumer-friendly than the Donald Duck products. Rather, R.W. merely argues that divergent inferences might be drawn from these undisputed facts, bearing on the issues of "essentiality" and "adversity" upon which Welch would be required to bear the burden of proof at trial, and that these competing inferences generated trialworthy issues not amenable to summary judgment.[6]

■ Even conceding the reasonableness of any such competing inferences, however, R.W.'s protestation that it committed no cognizable breach of "contract," or other act or omission sufficiently "adverse" to Welch's business interests to warrant termination, would not preclude summary judgment for Welch. Although Law 75, by its plain terms, makes the "just cause" inquiry turn solely on the *dealer's* actions or omissions, *see* P.R. Laws Ann. tit. 10, § 278, the Puerto Rico Supreme Court has read a "third" "just cause" into the statute to avoid constitutional invalidation, by holding that a principal's own

circumstances may permit its unilateral termination of an ongoing dealership, irrespective of the dealer's conduct. *See Medina & Medina v. Country Pride Foods, Ltd.*, 858 F.2d 817, 822–23 (1st Cir.1988) (responding to question certified in 825 F.2d 1 (1st Cir. 1987)).

■ After the principal in *Medina* unsuccessfully attempted in protracted good-faith negotiations to adjust its business to changed market conditions by renegotiating price and credit terms with its long-time dealer, it decided to terminate the dealer's contract, and withdraw from the Puerto Rico market. *Id.* at 818–19. The *Medina* court noted that an overly restrictive interpretation of Law 75's "just cause" requirement could place a principal in a serious dilemma under such circumstances: either capitulate to the dealer's price and credit terms and be held hostage in an interminable dealership relationship on disadvantageous terms, or unilaterally terminate the contract and expose itself to a costly lawsuit under Law 75. *Id.* at 822 & n. 4. Where the principal intends to retire entirely from the Puerto Rico market, however, little if any danger exists that the sort of exploitation proscribed by Law 75 can occur, since the retiring principal cannot hope to appropriate prospectively the product goodwill created by its dealer in the Puerto Rico market. *Id.* at 823. Thus, where the principal offers "reasonable" contract terms, but nonetheless arrives at a *bona fide* impasse in the negotiations, barring unusual circumstances not present here *Medina* ordains a determination that there was "just cause" for the unilateral dealership termination by the principal. *See id.; see also Borg Warner Int'l Corp. v. Quasar Co.*, No. CE–94–182, slip op. at 10 n. 8 (P.R. Mar. 14, 1996) (Official Translation).

■ "Absent controlling state court precedent, a federal court sitting in diversity may ... predict[ ] ... the course the state courts would take [if] reasonably clear." *VanHaar-*

---

**6.** For example, the parties dispute whether their mutual "contractual" commitment to contribute $50,000 apiece to advertise Welch frozen concentrate was to be performed during the one-year trial period following R.W.'s March 1988 desig-

nation, or whether this commitment would accrue only during a one-year trial period commencing from the date a final written dealership contract was signed.

*en v. State Farm Mut. Auto. Ins. Co.,* 989 F.2d 1, 3 (1st Cir.1993). In fact, this court predicted earlier that upon remand and further discovery Welch's asserted reasons for terminating R.W. might constitute "just cause" as enunciated in *Medina:*

> [W]e fail to see how applying Law 75 in the circumstances of this case necessarily would require Welch to continue a relationship it does not want in a manner to which it has serious objections. Law 75 simply requires a supplier to justify its decision to terminate a dealership. If Welch's conflict-of-interest concerns about R.W. are legitimate, we have no doubt that this would constitute "just cause" under Law 75.... *Medina & Medina* is not precisely on point because it involved a supplier's decision to totally withdraw from the Puerto Rico market following good-faith negotiations that failed to achieve agreement between the parties. There is no indication here that Welch intended to leave the market rather than find a new dealer. Nevertheless, we believe the principle underlying *Medina & Medina* is equally applicable in these circumstances, i.e., that *a supplier has just cause to terminate if it has bargained in good faith but has not been able "to reach an agreement as to price, credit, or some other essential element of the dealership."* This would be true at least where, as here, the supplier's market in Puerto Rico was well established before the current dealer relationship and the supplier's action therefore "is not aimed at reaping the good will or clientele established by the dealer."

*R.W. Int'l Corp.,* 13 F.3d at 484 & n. 4 (emphasis added).

■ Our discussion did not suggest that the "good faith" inquiry necessarily would be amenable to summary judgment, of course. Nonetheless, whereas the ultimate burden to prove "just cause" under the two-part *statutory* definition resides with the principal (i.e., Welch), *see Newell,* 20 F.3d at 22, the *bona fides* of contract negotiations must be presumed under Puerto Rico law. *See Borg Warner,* No. CE–94–182, slip op. at 10 n. 8. Consequently, at trial R.W. would bear the burden to establish Welch's bad faith for purposes of the *Medina* "just cause" determination.

R.W. has not met its burden as a nonmoving party under Fed.R.Civ.P. 56. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (if the nonmovant would bear the burden of proof on a particular issue at trial, its failure to adduce sufficient evidence to demonstrate its trialworthiness warrants summary judgment for the movant); *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 12 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995). As R.W. proffered no competent evidence to rebut the historical facts relied on by Welch to justify its unilateral termination—i.e., declining sales figures, the "shopper" omission, or the bottom-shelf freezer placements—we need only ask whether a rational jury could find *mala fides* or unreasonableness on the part of Welch in determining that R.W. was representing conflicting interests.

■ Even before R.W.'s March 1988 designation, Welch made clear that it appreciated R.W.'s distribution capabilities, but was extremely wary of its handling of Donald Duck frozen juice concentrate and of its plans to begin distributing Donald Duck bottled juice in January 1989. In order to get the Welch contract, Thomas Ward, R.W.'s president, agreed to the one-year trial period, the sales-volume commitments, and the mutual advertising expenditures. The parties understood that the one-year trial period would allow Welch to assess whether R.W. could distribute Donald Duck products while meeting its obligation to provide full marketing support for Welch products. In January 1989, however, there were strong signals that R.W. was shifting its primary attention to its newly expanded Donald Duck line, at Welch's expense. Although R.W. plausibly suggests that these indicia were either ambiguous, anecdotal, or aberrational, and that genuine factual issues may well remain as to whether these indicia signaled a "contract" breach or other sufficiently "adverse" action by R.W. under P.R. Laws Ann. tit. 10, § 278, R.W. has not shown that it was unreasonable for Welch, acting in presumed good faith, to interpret these signals as portending a trou-

bled business relationship ahead, and to withdraw from it. *Cf. Newell,* 20 F.3d at 23 (upholding verdict for dealer because principal had known for twenty-three years that dealer had been marketing competing product). Given that Welch already had a fifty-year presence in the Puerto Rico market before appointing R.W. in 1988, and that the parties reached a *bona fide* impasse on an essential modification to the terms of their ongoing dealer's "contract" (i.e., whether R.W. would continue to handle competing product lines), we conclude that a rational jury could not find that Welch acted in "bad faith." Accordingly, summary judgment was proper.

*The judgment is affirmed.*