**CHEMORGANICS, INC., Plaintiff,**

v.

**KEMWATER NORTH AMERICA, INC., et al., Defendants.**

No. Civ. 96–2483(SEC).

United States District Court, D. Puerto Rico.

March 19, 1999.

Jane Becker–Whitaker, Troncoso & Becker, San Juan, PR, for plaintiff.

Jeffrey M. Williams–English, David C. Indiano–Vicic, Indiano, Williams & Weinstein–Bacal, Hato Rey, PR, for defendants.

**OPINION AND ORDER**

CASELLAS, District Judge.

Pending before the court is defendant Kemwater North America, Inc.'s (hereinafter "Kemira/Kemwater" or "defendant") Motion for Summary Judgment **(Docket # 36)**, which was duly opposed by plaintiff Chemorganics, Inc. (hereinafter "Chemorganics" or "plaintiff") **(Docket # 42)**. Leave of court was granted, and defendants filed a reply to plaintiff's opposition **(Docket # 45)**. The matter thus stands submitted and is ready for disposition. For the reasons stated below in this Opinion and Order, defendant's motion for summary judgment **(Docket # 36)** is **GRANTED** and the above-captioned action shall be **DISMISSED**.

**Factual Background**

Plaintiff Chemorganics, Inc., a corporation duly registered under the laws of the Commonwealth of Puerto Rico, filed this diversity action against Kemwater North America, Inc. ("Kemira/Kemwater") pursuant to Act 75 of June 24, 1964, as amended, 10 L.P.R.A. § 278, et seq., ("Act 75") claiming unjust termination of its dealer/distributorship relationship with defendant.

On February 17, 1995 Mr. Thomas Crews, as President of Chemorganics, Inc., wrote a letter to Mr. Bert Renehov, President of Kemira Water Treatment, Inc. In said letter, Mr. Crews stated that Chemorganics had "been in conversation with Mr. Jeff Roberts to express our interest in a distributor agreement with your firm for water treating chemicals ..." **(Docket # 36, Exhibit 4, Letter of Thomas Crews to Kemira, hereinafter "Crews letter")**. In that same letter, Mr. Crews represented to Kemira/Kemwater that the company had "been established in Dominican Republic and Puerto Rico for over 10 years

from where we cover the Caribbean" and stated that they were the exclusive representatives in the area for several companies in the pharmaceuticals, cosmetics, and food chemicals. *Id.* It is an undisputed fact that Kemira/Kemwater had not entered the Puerto Rico market prior to its association with Chemorganics and Thomas Crews.

As it turns out, Chemorganics was in fact a corporation which had been dormant or inactive for fifteen years, until it was reactivated by Mr. Crews for the sole purpose of establishing a relationship with Kemira/Kemwater. It was not doing any business whatsoever and was not representing the afore-mentioned companies.

Chemorganics and Kemira/Kemwater never entered into a formal, written distributorship agreement. Nevertheless, Mr. Crews maintains that on the 27th or 28th of February of 1995, the parties "made a verbal exclusive agreement" for the sale of Kemira/Kemwater's PAX 11 product. In his deposition, when asked about his understanding of the reach of the verbal agreement, Mr. Crews stated: "I was, I have a sales territory, a geographic sales territory, and uhh, I was to, buy and resell the material wherever I could, in that territory." **(Docket # 36, Exhibit 1, page 64, hereinafter Crews' deposition).**

Mr. Jeff Roberts, a salesman in Kemira's Georgia operation, sent a letter addressed to whom it may concern stating that Chemorganics was the exclusive distributor of PAX 11 for Puerto Rico. Defendant claims that Mr. Roberts has no legal authority to enter into this kind of agreement and that in addition, the letter was only sent at the request of plaintiff who allegedly falsely told defendant that such a letter was a requirement in the PRASA bidding process. Plaintiff has not presented evidence rebutting defendant's assertions regarding the reasons said letter was sent.

Chemorganics' operations were run exclusively out of Mr. Crews' home apartment, and beside Mr. Crews, its staff consisted solely of his common-law wife who assisted as a part-time secretary. Chemorganics did not own any storage or warehouse facilities, nor did it own any transportation equipment. While Chemorganics claims that it rented warehouse storage space from Meteoro Freight Consolidators, Inc. ("MEFCO"), these invoices with sequential invoice numbers were originated years after the storage charges were allegedly incurred and they were never paid by Chemorganics to MEFCO. When asked in his deposition if the invoices presented were generated after the filing of this action, Mr. Crews evaded the question and stated that he could not recall because the invoices were handled by "the accounting people." As stated above, Chemorganics' entire operating staff consisted of Mr. Crews and his wife.

Furthermore, although Mr. Crews claims that it paid MEFCO for transportation services, it could produce no documents or invoices to support that contention. PAX 11 is a chemical compound of a hazardous and corrosive nature, which requires special handling and packaging: a federal requirement specifies that every time that it is transported from any point it must have a Material Safety Data Sheet ("MSDS") filled out by each and every handler. Upon a request for production of documents by defendant, Chemorganics was unable or unwilling to produce even one MSDS relating to PAX 11. Thus, there is absolutely no *bona fide* evidence that Chemorganics actually transported PAX 11 at any point during the alleged distributorship agreement with Kemwater/Kemira. Mr. Crews also admitted that he was never at the port to receive the shipments of PAX 11.

Mr. Crews claims that a separate company, Transport Maintenance and Engineering, was used as a consignee for the PAX 11 being shipped. However, when asked in his deposition regarding the precise role and purpose of said company, Mr. Crews admitted that it was a "paper oper-

ation", that "it does nothing, it's just a name" and that it "hasn't operated for 3 to 5 years." **Crews' deposition at page 155– 56.** Finally, he admitted that Transport Maintenance and Engineering had "no relationship with Kemira" and that it did not transport any of the PAX 11 product.

Instead, virtually all evidence presented for the purposes of this motion for summary judgment indicates that the receipt, transportation, and storage of the PAX 11 product that was ordered from Kemira/Kemwater by Chemorganics was in fact carried out by GLC/Borinquen Sternson, who is a competitor of Kemira/Kemwater. The undisputed evidence reveals that GC/Borinquen Sternson was Chemorganics' only customer during the entire length of the relationship between Chemorganics and Kemira/Kemwater and that it undertook the responsibility of unloading, transporting, and storing the PAX 11 that Chemorganics ordered from Kemira/Kemwater. GC/Borinquen Sternson would then repackage the PAX 11 under its own label and sell it to the Puerto Rico Aqueduct and Sewer Authority ("PRASA") as its own.

Chemorganics never notified Kemira/Kemwater that it was selling its product to GC/Borinquen Sternson who was in turn repackaging it and selling it to PRASA, the main customer for PAX 11 on the Island, as its own. In addition, PRASA was never aware that it was in fact buying PAX 11 instead of GC/Borinquen Sternson's competing product. With PRASA as the main goal customer in Puerto Rico, Chemorganics failed to comply with the requirements imposed by PRASA in a bidding process for the purchase of defendant's product; as such, Kemira/Kemwater failed to secure an opportunity to supply PAX 11 to PRASA.

## Applicable Law and Analysis

### A. Summary Judgment Standard

The First Circuit has cogently noted that:
[s]ummary judgment is a means of determining whether a trial is actually re-

quired. It is appropriately granted when the record shows that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Thus, in order to defeat a properly crafted summary judgment motion, the party opposing it must demonstrate that a trialworthy issue looms as to a fact which could potentially affect the outcome of the suit.

*Serapion v. Martinez*, 119 F.3d 982 (1st Cir.1997). *See also McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995).

In determining whether to grant a summary judgment, the Court may not weigh the evidence. *Casas Office Machines, Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668 (1st Cir.1994). Summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." *Id. citing Greenburg v. Puerto Rico Maritime Shipping Authority*, 835 F.2d 932, 936 (1st Cir.1987). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the nonmoving party. *Casas Office Machines*, 42 F.3d at 684.

The mere existence of a factual dispute is not, however, enough to defeat summary judgment. *United Structures of America, Inc. v. G.R.G. Engineering, S.E.*, 927 F.Supp. 556, 560 (D.Puerto Rico 1996). In those cases where there are factual disputes, summary judgment will be deemed proper if the unresolved facts are not genuine and material to the resolution of the case. *Corporacion Insular de Seguros v. Reyes Munoz*, 849 F.Supp. 126, 132 (D.Puerto Rico 1994). For a dispute to be "genuine", "the factual controversy 'must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side'." *Lynne Woods–Leber v. Hyatt Hotels of Puerto Rico, Inc.*, 124 F.3d 47 (1st Cir.1997). *See also U.S. v. One Parcel of Real Property*, 960 F.2d

200, 204 (1st Cir.1992); *Boston Athletic Assn. v. Sullivan*, 867 F.2d 22, 24 (1st Cir.1989). By like token, for a dispute to be deemed "material," the fact must be one that might affect the outcome of the suit under the governing law. *Morris v. Government Development Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir.1994).

Recent case law has established that "summary judgment may be appropriate '[e]ven in cases where elusive concepts such as motive or intent are at issue ... if the nonmoving party rests merely upon conclusory allegations, improbable inferences and unsupported speculation'." *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 259 (1st Cir.1994) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco, Co.*, 896 F.2d 5, 8 (1st Cir.1990)).

It thus seems that, at least as long as it is the non movant [that] bears the ultimate burden of proof at trial, he [will] not [be able to] defeat a motion for summary judgment by relying upon evidence that is "merely colorable" or "not significantly probative." *Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir.1993), *referring to Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "To the contrary, the non movant [will have to] 'present definite, competent evidence to rebut the motion.'" *Pagano*, 983 F.2d at 347, *referring to Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992).

## B. Act 75 Claim

The first issue before the Court is whether Chemorganics was a "dealer" as defined by Act 75 and as such would have a recourse under the Act. The statute defines "dealer" as one "interested in a dealer's contract" because of having "effectively in his charge in Puerto Rico the distribution, agency, concession or representation of a given merchandise or service." 10 L.P.R.A. § 278(a). Furthermore, the statute defines "dealer's

contract" as a relationship in which the dealer "effectively takes charge of the distribution of a merchandise, or of the rendering of a service, by concession or franchise, on the market of Puerto Rico." 10 L.P.R.A. § 278(b).

The legislative purpose of Act 75 has been amply discussed, both by this court and the Supreme Court of Puerto Rico. "The purpose of this Act was to remedy the abusive practices of suppliers who arbitrarily eliminated distributors after they had invested in the business to build a market for the supplier's product or service." *Gonzalez v. Brown Group, Inc.*, 628 F.Supp. 436, 439 (D.Puerto Rico, 1985), *citing Warner Lambert v. Tribunal Superior*, 101 D.P.R. 378 (1973). Due to the remedial nature of Act 75, its scope is necessarily broad. That said, however, this court has held that "the Puerto Rico Legislature indicated that it did not intend to extend Law 75 protection to every middle person, between the manufacturer and the consumer, in contact with a product or service." *Id.* Thus, the inquiry of whether a particular plaintiff is a "dealer" for purposes of the Act is a threshold one in determining whether it is protected by the liberal provisions of Act 75.

In *San Juan Mercantile Corp. v. Canadian Transport*, 108 D.P.R. 211 (1978), the Supreme Court of Puerto Rico held that a dealer "endeavors to create a favorable market and to draw customers to the product or services by promoting and closing sales contracts." *Id.* at 215. In *EBI, Inc. v. Gator Industries, Inc.*, 807 F.2d 1, 3 (1st Cir.1986), the First Circuit Court of Appeals relied upon eight factors earlier set out by the Puerto Rico Supreme Court in *San Juan Mercantile* to reach the conclusion that plaintiffs were not dealers under the Act. In that case, the Supreme Court aimed to flesh out the "very sketchy definitions" contained in the statute and enumerated the following eight activities to be taken into account in making the determination of whether a plaintiff is a dealer: (1) activities necessary to the transporta-

tion of the products or services from the manufacturer to the consumer or to some point in between; (2) publicity; (3) market coordination; (4) merchandise deliveries; (5) collections; (6) keeping of an inventory; (7) promotion; and (8) closing of sales contracts. However, said list is neither exhaustive nor determinative, and thus, "the absence of one or more criteria is not *per se* determinative." *Jorge Rivera Surillo & Co., Inc. v. Cerro Copper Products Company*, 885 F.Supp. 358, 362 (D.Puerto Rico, 1995), *citing Roberco, Inc. Y Colon v. Oxford Inds., Inc.*, 122 D.P.R. 115, 132 (1988).

The Puerto Rico Supreme Court has further defined the dealer/principal relationship as one of "continuity, stability, mutual trust, coordination between parties as independent entrepreneurs, devoid of hierarchical subordination, and in whom [plaintiff] has made a substantial investment." *J. Soler Motors, Inc. v. Kaiser Jeep International Corp.*, 108 D.P.R. 134, 142 (1978). This Court has also previously held that "a dealer cannot be defined by the activity of promoting merchandise and creating a market alone." *Brown Group*, 628 F.Supp. at 440.

In light of the above-cited criteria we must then determine whether Chemorganics is a "dealer" within the meaning of Act 75. We find that it is not as Chemorganics did not endeavor to create a favorable market for defendant's product in Puerto Rico. Chemorganics basically limited its activities to selling defendant's product to its main competitor on the Island, in clear detriment of defendant's future position in the market. If the principal end user of the product in the Puerto Rico market, PRASA, was unaware that the product it was purchasing from GC/Borinquen Sternson was in fact PAX 11, there was no way for defendant to truly establish itself in the Puerto Rico market. To that end, it is highly probative of the true nature of Chemorganics' business relationship with defendant that it admittedly failed to tell either defendant or PRASA that the PAX 11 was not being sold directly to PRASA but instead was being repackaged and sold to PRASA by GC/Borinquen Sternson.

Out of the eight factors listed by the Puerto Rico Supreme Court in *Kaiser Jeep*, we find that Chemorganics, even taking the evidence in the light most favorable to its status under the Act, at most meets two, that of the closing of sales contracts and of carrying out publicity. However, even such an attribution is dubious in light of the fact that its only customer on the Island was not a *bona fide* purchaser/end user of the PAX 11, but rather, Kemira/Kemwater's main competitor in Puerto Rico. Furthermore, plaintiff's actual promotion of the product was quite limited indeed and cannot be deemed a substantial effort to promote defendant's product.

From the evidence, it is clear to the Court that plaintiff was merely a broker on the Island, acting as a secret link between Kemwater/Kemira and GC/Borinquen Sternson. Plaintiff has admitted that GC/Borinquen Sternson was its only customer and that the entire stock of PAX 11 that it ordered from defendant was destined for GC/Borinquen Sternson through a verbal agreement. Furthermore, defendant has admitted that GC/Borinquen Sternson picked up the PAX 11 at the port, loaded it onto its trucks, and took it to its facility, all with its own equipment, and without any involvement whatsoever on the part of Mr. Crews. It appears that Chemorganics assumed no risk with respect to these orders because it did not have to make any investment to acquire, transport or store the product, and it only ordered pursuant to GC/Borinquen Sternson's needs as it was its sole customer.

Chemorganics' claim that it created a market in Puerto Rico for defendant's product when it did not previously exist rings hollow in light of the reality that its actions merely facilitated GC/Borinquen Sternson's compliance with its contract with PRASA and in fact failed to even complete a bid for PRASA's business. We

firmly believe that the scope of Act 75 does not extend to a business relationship such as this one, and that Chemorganics does not meet the Act's definition of "dealer".[1]

## Conclusion

Pursuant to the above discussion, defendant's motion for summary judgment (**Docket # 36**) is **GRANTED.** The above-captioned case shall be **DISMISSED.** Judgment shall be entered accordingly.

**SO ORDERED.**

1. Because we find that plaintiff does not meet the Act's definition of "dealer", we do not reach the second argument raised by defendant, that it had "just cause" to terminate its contractual relationship with plaintiff, as it is set forth in the Act. That said, however, the Court notes that under the applicable caselaw, particularly *R.W. International Corp. v. Welch Foods, Inc.*, 88 F.3d 49 (1st Cir. 1996), defendant had ample "just cause" for terminating its contractual relationship with plaintiff, insofar as plaintiff's actions were "sufficiently egregious to have 'adversely and substantially affect[ed] the interest of the principal or grantor in promoting the marketing or distribution of the merchandise or service.' " *Id.*, *quoting Pan Am. Computer Corp. v. Data Gen. Corp.*, 652 F.2d 215, 217 n. 2 (1st Cir.1981).