<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 98-1595

            ILEANA IRVINE, IRG RESEARCH GROUP, INC.,
                     Plaintiffs, Appellees,

                               v.

            MURAD SKIN RESEARCH LABORATORIES, INC.,
                     Defendant, Appellant.

                      ____________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

       [Hon. Carmen Consuelo Cerezo, U.S. District Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

                     Selya, Circuit Judge,

               and Acosta, Senior District Judge.

                     _____________________

   Vincent J. Syracuse, with whom Newman Tannenbaum Helpern
Syracuse & Hirschtritt LLP, David A. Pellegrino and Luis N. Blanco-
Matos were on brief, for appellant.
   Jossie Yunque-Lpez and Ral Gonzlez-Toro, for appellees.

                      ____________________

                      November 15, 1999
                      ____________________

                        AMENDED OPINION
                      ____________________

        ACOSTA, Senior District Judge.  On appeal defendant-
appellant Murad Skin Research Laboratories, Inc. ("Murad")
challenges the verdict rendered in favor of both plaintiffs IRG
RESEARCH GROUP, INC. ("IRG") and Ileana Irvine ("Irvine").
Specifically, Murad alleges that the district court erred by (1)
not granting its motion for judgment as a matter of law; (2)
declining to charge the jury in accordance with its proffered
instruction on foreseeability; (3) denying its petition for a new
trial; and (4) allowing the testimony of plaintiffs' expert
witness.
 On review we agree with Murad's reasoning that it is
entitled to a new trial vis--vis IRG, and that Irvine's individual
claim should have been dismissed as a matter of law.
                           BACKGROUND
 Murad is a stateside manufacturer of skin care products.  
Irvine and her daughter, Catherine Irvine Sarnataro, both
"aestheticians," i.e. skin care specialists, first came in contact
with the Murad line of products at a trade show in Chicago in 1989.  
Irvine testified at trial that there was a "glycolic acid
revolution" in the industry at the time and she found the glycolic
acid manufactured by Murad to be the "most effective" of all the
other products available in the market.  Initially, she purchased
Murad products for her own clients but since 1991 she also sold
them to various salons.
 Subsequently, Irvine and her daughter met periodically
with Dr. Howard Murad, president of Murad, at various conferences
and conveyed to him an interest in becoming the exclusive
distributor of Murad products in Puerto Rico.  The conversations
culminated in a provisional exclusive distribution agreement dated
September 2, 1993 with IRG, a corporation established and
controlled by Irvine and her daughter.  The contract would be
extended after December 1994 conditioned upon IRG meeting certain
sales quotas.
 Both Irvine and her daughter testified regarding their
efforts on behalf of IRG to develop a market for the Murad skin
products in Puerto Rico which included promotions, advertisements,
demonstrations, training and education of both aestheticians and
dermatologists.  IRG operated through its own clinics and also sold
to aestheticians and medical offices.
 In May 1994 Murad broadcast an infomercial on various
stateside cable television stations as part of its advertising
campaign.  Dr. Murad testified that the purpose behind the
infomercial was to expose their home products to customers and also
to lure them into the salons for professional treatment.  Unbeknown
to Murad, a New York station relayed the infomercial to Puerto Rico
and its products were thereby made available locally through
telemarketing.
 According to plaintiffs-appellees, the infomercial marked
the beginning of the economic downfall of both IRG and Irvine.  
After IRG learned of the telemarketing incursion, it sought relief
under the Puerto Rico Distributorship Act, Law 75 of June 24, 1964,
P.R. Laws Ann. tit. 10  278 et seq. (1997) whereas Irvine sued
under the local torts statute.  The jury found for plaintiffs-
appellees and awarded $390,000 to IRG and $100,000 to Irvine as
damages.
                            RULE 50
 Petitions for judgments as a matter of law under Rule
50(a)(1) Fed. R. Civ. P. will be granted only in those instances
where, after having examined the evidence as well as all
permissible inferences drawn therefrom in the light most favorable
to non-movant, the court finds that a reasonable jury could not
render a verdict in that party's favor.  Wills v. Brown Univ., 184
F.3d 20, 28 (1st Cir. 1999); Mangla v. Brown Univ., 135 F.3d 80, 82
(1st Cir. 1998); Ed Peters Jewelry Co. v. C & J Jewelry Co., 124
F.3d 252, 261 (1st Cir. 1997); Bogosian v. Mercedes-Benz of N. Am.,
Inc., 104 F.3d 472, 475 (1st Cir. 1997); Speen v. Crown Clothing
Corp., 102 F.3d 625, 628 (1st Cir. 1996), cert. denied, 520 U.S.
1276, 117 S. Ct. 2457, 138 L.Ed.2d 214 (1997).  In carrying out
this analysis the court may not take into account the credibility
of witnesses, resolve evidentiary conflicts, nor ponder the weight
of the evidence introduced at trial.  Ramos v. Davis & Geck, Inc.,
167 F.3d 727, 731 (1st Cir. 1999); Alvarez-Fonseca v. Pepsi Cola
Bottling Co. of P.R., 152 F.3d 17, 23 (1st Cir. 1998), cert.
denied, No. 98-8641, ___ U.S. ___, 1999 WL 170188 (May 17, 1999);  
Logue v. Dore, 103 F.3d 1040, 1043 (1st Cir. 1997);  Speen, 102
F.3d at 637; Katz v. City Metal Co., Inc., 87 F.3d 26, 28 (1st Cir.
1996).
 In order to overcome a Rule 50 petition the party
carrying the burden of proof must have introduced at trial
sufficiently adequate evidence for the jury to determine the
plausibility of a particular fact.  "Thus, in order to support a
jury finding on such an issue, the evidence presented must make the
existence of the fact to be inferred more probable than its
nonexistence."  Alvarez-Fonseca, 152 F.3d at 24; Katz, 87 F.3d at
28; Richmond Steel, Inc. v. Puerto Rican Am. Ins. Co., 954 F.2d 19,
22 (1st Cir. 1992); Malav-Flix v. Volvo Car Corp., 946 F.2d 967,
971 (1st Cir. 1991).
 A mere scintilla of evidence will not rise to a triable
issue of fact necessary to avoid dismissal under Rule 50.  Crane v.
Green & Freedman Baking Co., Inc., 134 F.3d 17, 21 (1st Cir. 1998);
Ed Peters Jewelry, 124 F.3d at 261; Coyante v. P.R. Ports Auth.,
105 F.3d 17, 21 (1st Cir. 1997); Speen, 102 F.3d at 637.  Nor will
"conjecture" or "speculation" over the evidence presented provide
sufficient grounds  to warrant a fact finding determination by the
jury.  Russo v. Baxter Healthcare Corp., 140 F.3d 6, 8 (1st Cir.
1998) (citing Katz v. City Metal Co., 87 F.3d at 28).
 On appeal we will review the record de novo employing the
same criteria applicable to the trial court, and decide whether, as
defendant/appellant contends, the jury in this case "as a rational
factfinder could have reached no conclusion except that the
plaintiff[s] take nothing."  Logue v. Dore, 103 F.3d at 1043.  See
also Sheils Title Co., Inc. v. Commonwealth Land Title Ins. Co.,
184 F.3d 10, 17 (1st Cir. 1999); Russo, 140 F.3d at 8; Speen, 102
F.3d at 628; Katz, 87 F.3d at 28.
                           NEW TRIAL
 The nisi prius court's denial of a petition for new trial
will be overturned only for abuse of discretion.  A new trial is
warranted only in those situations where the verdict is contrary to
the clear weight of the evidence introduced at trial and its
ratification would result in a miscarriage of justice.  Sheils
Title Co., 184 F.3d at 17; Ramos, 167 F.3d at 731; Bogosian, 104
F.3d at 482.
                             LAW 75
                           Generally
 Puerto Rico's Law 75 governs the business relationship
between principals and the locally appointed distributors/dealers
for marketing their products.  The statute was initially enacted to
avoid the inequity of arbitrary termination of distribution
relationships once the designated dealer had successfully developed
a local market for the principal's products and/or services.  
Sheils Title Co., 184 F.3d at 14; Euromotion, Inc. v. BMW of N.
Am., Inc., 136 F.3d 866, 870 (1st Cir. 1998); Borschow Hosp. and
Med. Supplies, Inc. v. Csar Castillo, Inc., 96 F.3d 10, 14 (1st
Cir. 1996); R.W. Intern. Corp. v. Welch Foods, Inc., 88 F.3d 49, 51
(1st Cir. 1996).  In order to accomplish its goal Law 75 limited
the principal's ability to end the relationship unilaterally except
for "just cause,"  278a, while subjecting the principal to  
considerable economic liability for unjustifiable terminations.  
See  278b of Law 75 (enumerating factors to consider in
calculating award).
 In 1966 the protection afforded to dealers under Law 75
was extended to include the conduct of a principal which even
though it did not end the contract it was deemed detrimental to
the distribution relationship.  The amendment further provided that
impairments without just cause would subject the infringing party
to the same liability provided for terminations under  278b.
                           Impairment
 Law 75 enumerates some instances of impairment by way of
illustration and establishes a rebuttable presumption of
impairment whenever a principal bypasses a dealer by distributing
merchandise directly; appoints additional dealers in contravention
of the agreement; fails to adequately fill orders; or arbitrarily
changes the transportation and/or payment terms.   278a-1(b)(1)-
(4).
 The protection afforded dealers by Law 75, however, is
circumscribed by those rights acquired under the agreement
regulating their business relationship.  Therefore, whether or not
an impairment has taken place will depend upon the specific terms
of the distribution contract.
     The question whether there has been a
 "detriment" to the existing relationship
 between supplier and dealer is just another
 way of asking whether the terms of the
 contract existing between the parties have
 been impaired.

Vulcan Tools of P.R. v. Makita USA, Inc., 23 F.3d 564, 569 (1st
Cir. 1994).
 The parties do not dispute the fact that, pursuant to the
agreement dated September 2, 1993, IRG had the exclusive
distribution rights of Murad products in Puerto Rico during a trial
period lasting from August 25, 1993 through December 31, 1994.  
Further, the document provided that should IRG meet a particular
sales quota it would qualify to act as Murad's exclusive
distributor for an additional two years.
 It is also uncontested that through its infomercial,
which commenced airing in Puerto Rico in May 1994, Murad sold its
products directly to local clientele.  The uncontroverted evidence
at trial also established that Murad never intended the broadcast
to be aired in Puerto Rico.  This was a fortuitous event brought
about by cable carriers not related to Murad in any way.
 Murad argues that it is not liable for impairment of the
relationship because once notified by plaintiffs-appellees of the
broadcast in Puerto Rico it promptly gave instructions for this
sales mode to be discontinued.
 A principal may not be held accountable for unknown
market interference by third parties.  However, once put on notice
that its products are reaching an area of limited distribution
rights a principal has the obligation to take prompt positive
action to curtail the practice.  Even though its role was not to
"stand as a vigilant dog", Gen. Office Prod. Corp. v. Gussco Mfg.,
Inc., 666 F. Supp. 328, 333 (D.P.R. 1987), once informed of the
local transmission Murad did have an affirmative duty to ensure
that the direct sales would cease and avoid further interference
with the Puerto Rico market.
 Murad argues that it was alerted to the local
transmission of the broadcast "for the first time" via a letter
dated October 14, 1994 forwarded by Catherine Irvine (Appellant's
brief at 6) and that it immediately responded by taking steps to
avoid its recurrence.  However, there is enough information in the
record from which a reasonable jury could infer that Murad was
advised of the broadcast much earlier than October 14, 1994.
 At trial Dr. Murad acknowledged having been informed of
the broadcast matter "a few weeks before" receiving the October 14,
1994 letter.  Further, this correspondence makes reference to a
request made by IRG "[a]bout a month ago" for a list of local
customers who had placed orders through the infomercial which
presupposes Murad had been notified of this practice long before
the letter was mailed.  The letter also points to an earlier
telephone call by Gerard Sarnataro, Catherine Irvine's husband, on
behalf of IRG "several days ago" notifying of direct orders placed
by him and others.  Lastly, the letter was a follow-up to a prior
conversation between Catherine Irvine and Dr. Murad demanding some
kind of response from Murad which again proves earlier contacts
regarding the prohibited availability of Murad products through the
infomercial.
 Irvine also testified that she, her daughter and son-in-
law "started feeling the negative effects" of the infomercial in
the summer of 1994.  She related how  customers and beauty salon
owners complained to her that the products were being made
available through the television at lower prices.  Irvine further
indicated that she, her daughter and her son-in-law "immediately
got in touch with Mr. Angelo Fiorita," Murad's representative, to
express their concern (emphasis ours) and that Mr. Fiorita
responded that he would "speak with Dr. Murad and . . . take the
necessary steps for this to stop happening.".  However, according
to Irvine's testimony, "[n]othing happened."  Irvine explained that
the October 1994 letter was eventually sent to Murad because the
situation continued to worsen without any corrective measures being
taken by Murad.
 Gerard Sarnataro testified that he placed orders from
Puerto Rico "several times to test out" how long Murad would
continue the practice of selling the products directly in the local
market.  Mr. Sarnataro further indicated that he continued
purchasing products from Puerto Rico and calling Murad to object to
what he considered an unauthorized practice.  At trial
Mr. Sarnataro also described how, despite his complaints,
approximately two months later he had been approached over the
telephone to inquire if he was interested in reordering Murad's
products.
 Murad's first remedial action was taken on October 25,
1994.  Because the jury could logically infer that Murad was put
on notice of the interference soon after May 1994 Murad's argument
that it responded diligently is undermined by the evidence in the
record.  Therefore, a reasonable fact finder could have found that
the exclusive distribution provision of the contract had been
impaired by Murad's failure to take prompt positive action in
reacting to IRG's complaints.  However, our analysis under Law 75
does not conclude here.
                            Damages
 Law 75 establishes a formula for the indemnification of
dealers/distributors in the event of either termination or
impairment to the relationship by a principal without just cause.  
However, Law 75 specifically limits payment "to the extent of the
damages caused [the dealer/distributor]"  278b (emphasis ours).  
It is clear from reading this provision that damages will not be
automatically conferred in all cases of termination and/or
impairment.  In this regard the Puerto Rico Supreme Court
specifically held in Marina Indus. Inc. v. Brown Boveri Corp., 114
D.P.R. 64, 90 (1983) that the factors enumerated in  278b are not
mandatory.  Rather, they constitute guidelines to be utilized
contingent upon the presentation of adequate proof in each case.  
Further, in Marina Industrial the Supreme Court acknowledged that
evidence of damages is an essential element of a Law 75 violation
as to which plaintiff bears the burden of proof.  Therefore, in
order to prevail, a Law 75 plaintiff must submit evidence of
damages as part of its action.
     A claim for impermissible termination
 or impairment of a dealership contract under
 section 278 has two essential elements; that
 the contract existing between the parties was
 impaired or terminated without just cause and
 that there were resulting damages.  After the
 plaintiff has shown an impairment or
 termination of the contract, the defendant may
 offer the affirmative defense of just cause.  
 If there was no just cause, the plaintiff must
 show damages.

Draft-Line Corp. v. Hon Co., 781 F. Supp. 841, 843 (D.P.R. 1991)
aff'd, 983 F.2d 1046 (1st Cir. 1993) (unpublished table decision).
 The jury awarded IRG $390,000 as damages under Law 75.
Murad argues that it is entitled to a new trial because the award
was based on the testimony of IRG's expert witness who relied on
unsubstantiated facts for rendering his opinion.
 The opinion rendered by plaintiffs' expert to justify
IRG's damages was based on a formula using the ratio between the
number of clinics opened by IRG and the corresponding volume of
sales.  The expert then proceeded to make a projection of the
anticipated sales of IRG had it opened 25 clinics within a term of
five years as originally planned.
 Murad argues the district court should have stricken the
testimony of the accountant regarding IRG's economic losses as
unreliable under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509
U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993), because the
expert's opinion was purportedly based on erroneous factual
information.  In Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137,
119 S. Ct. 1167, 143 L.Ed.2d 238 (1999) the Supreme Court explained
that the presiding judge's role as "gatekeeper" in ensuring the
reliability and relevancy of expert testimony as discussed in
Daubert extends to opinions in both scientific and non-scientific
fields.  However, the trial court has ample discretion in devising
the appropriate criteria for its determination on a case by case
basis.  "[W]hether Daubert's specific factors are, or are not,
reasonable measures of reliability in a particular case is a matter
that the law grants the trial judge broad latitude to determine."  
Kumho Tire 119 S. Ct. at 1175.  Further, this "same kind of
latitude" will be afforded to the judge in selecting the procedure
to be utilized for the inquiry.  Id.  A trial court's decision to
exclude or admit expert testimony will be only be reversed for
abuse of discretion.  Id. at 1171.
 On appeal Murad points to alleged inaccuracies in the
underlying facts utilized by the expert in reaching his
conclusions, which according to defendant-appellant render his
assessment of IRG's damages unreliable.  In particular, Murad
claims that the accountant utilized incorrect sales data in
determining the losses attributed to the alleged impairment.  
According to the expert, IRG's net income from Murad sales and
services for the fiscal year ending in July 1994 amounted to
$71,468.
 The accountant testified that "the net income from the
sales and services related to the Murad product, which was the
whole operation of IRG, were $71,468 [for fiscal year 1994]."  
These computations were based on the assumption that Murad products
represented 100% of IRG sales of products and services throughout
the entire year.  The expert indicated that the percentage utilized
by him in rendering his opinion was based exclusively on the
representations made by IRG management.  He did not examine any
documents pertaining to IRG's purchases or sales to verify the
accuracy of this information.
 However, during the first two months utilized by the
accountant in determining IRG's net income Murad products
represented only a small fraction of its sales.  This is confirmed
in a letter dated August 23, 1993 wherein IRG indicated to Murad
that gross sales of Murad products "has been at under 20%" and
projected an increase to "40% of the gross product sales being
Murad products."
 IRG has attempted to down play the relevance of this
information arguing that the August 23, 1993 correspondence
anteceded the distribution agreement dated September 2, 1993 and
the introduction of Murad's Spa Line.  However, there is no
evidence in the record establishing the specific percentage of the
net income derived from Murad products and/or services subsequent
to the distribution agreement.  The only information in the record
is that the Spa Line was introduced "[i]n early 1994" without
regard to a particular sales volume and the testimony of Catherine
Irvine Sarnataro acknowledging that non-Murad products had been
sold by IRG during fiscal year 1993-94.
 According to Mr. Alvarez-Menndez, IRG's expert witness,
"[i]f they [IRG] sold other products besides the Murad product,
definitely the calculations will have to change."  Thus, his
conclusion regarding IRG's net income for the year preceding the
infomercial was contingent on Murad products representing 100% of
IRG's business.
 Based on the information in the record it is impossible
to determine what percentage of the IRG income was attributed to
Murad products for this period much less conclude that it
represented 100% as claimed by IRG.  Therefore, the basic premise
of the expert's opinion to justify damages under Law 75 is flawed.  
Absent adequate factual data to support the expert's conclusions
his testimony was unreliable.  Further, it appearing that in
awarding damages to IRG the jury accepted the expert's unreliable  
computations, a new trial regarding IRG damages under Law 75 is
warranted.
                        INDIVIDUAL CLAIM
 The jury awarded Ileana Irvine $100,000 as damages for
her pain and suffering and loss of reputation due to Murad's
negligent actions regarding the infomercial.
 Murad contends that Irvine has no personal cause of
action and that there was no evidence of a causal relationship
between its "purchase of air time for the infomercial at a New York
television station" and Irvine's purported damages (Appellants'
Brief at 28).
 In this jurisdiction tort liability is governed by art.
1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31,  5141
(1990) which imposes responsibility for damages caused by
negligence or fault.  The necessary elements to prevail in a tort
action are: (1) a negligent act or omission, (2) damages and (3) a
causal relationship between them.  De-Jess-Adorno v. Browning
Ferris Indus. of P.R., Inc., 160 F.3d 839, 842 (1st Cir. 1998);
Marshall v. Prez-Arzuaga, 828 F.2d 845, 847 (1st Cir. 1987);
Montalvo-Feliciano v. Cruz-Concepcin, 144 D.P.R. ____,  98 JTS 6
at 495, 499 (1998); Toro-Aponte v. E.L.A., 142 D.P.R. ____, 97 JTS
18 at 627 (1997).
 Not all actions or omissions which result in
injuries/damages will give rise to liability under art. 1802.  
"Negligence has been defined by the Commonwealth courts as the
failure to exercise due diligence to avoid foreseeable risks."  
Malav-Flix, 946 F.2d at 971.  Therefore, liability will only
arise if the damages complained of were reasonably foreseeable to
the defendant.  De-Jess-Adorno, 160 F.3d at 842; Montalvo-
Feliciano, 144 D.P.R. ____, 98 JTS at  499; Toro-Aponte, 142 D.P.R.  
____, 97 JTS at 627; Ocasio-Juarbe v. Eastern Airlines, Inc., 125
D.P.R. 410, 418 (1990), official translation reproduced in full in
902 F.2d 117 (1st Cir. 1990); Rivera-Prez v. Cruz-Corchado, 119
D.P.R. 8, 18 (1987).  The duty of care imposed upon a tortfeasor is
anticipating reasonably probable injuries to probable victims.  
Marshall v. Prez-Arzuaga, 828 F.2d 847.  See Herminio M. Brau, Los
Daos y Perjuicios Extracontractuales en Puerto Rico  7.02[2] at
184-5 (2d ed. 1986).  The foreseeability contemplated by the
statute does not include every conceivable consequence of an act or
omission since to do so would make the defendant an absolute
insurer.  See Montalvo-Feliciano, 144 D.P.R. ____, 98 JTS at 499;
Pacheco v. A.F.F., 112 D.P.R. 296, 300 (1982); Jimnez v.
Pelegrina-Espinet, 112 D.P.R. 700, 704 (1982).
 For purposes of our analysis we will assume that the
conduct complained of by Irvine in support of her negligence claim
is the same utilized by IRG for its Law 75 action, i.e., allowing
the Murad products to be sold directly in Puerto Rico.
 Inasmuch as our review of the claim is limited by the
constraints of a Rule 50 motion, the issue then becomes whether
there is sufficiently reliable evidence in the record for a jury to
conclude that the mental anguish and loss of reputation averred by
Irvine were reasonably to be foreseen to Murad as a probable
consequence of the infomercial.  In other words whether, based on
the facts presented at trial as well as the permissible inferences
derived therefrom, it was reasonable for the trier of fact to find
that Murad should have anticipated the resulting damages to Irvine
individually.  As previously mentioned, there is no actionable
claim under art. 1802 if the particular injury/damage complained of
by Irvine could not have been reasonably foreseen by Murad.
 Even though Irvine described in detail the alleged
injuries to her reputation, humiliation and pain and suffering
caused by Murad's airing of the infomercial in Puerto Rico,
liability based on art. 1802 cannot rest on the existence of an
injury alone.  Irvine did not introduce any evidence to explain
why it should have been reasonably foreseeable to Murad that  
making its products available in Puerto Rico at lower prices would
somehow affect her personally.  At trial when asked by her counsel
to describe her relationship with Murad, separate from that of IRG,
Irvine merely responded that it was "cordial" and that she found
Dr. Murad "very pleasant."  Her testimony in this regard was
circumscribed by the tenor of her and her daughter's contacts with
the Murad representatives.  No mention was made of any particular
circumstances in her dealings with Murad which would support her
individual claim.
 Additionally, the documentary evidence submitted at trial
further supports Murad's theory.  The distribution agreement was
made with the corporation, not Irvine.  All the correspondence
available in the record which was exchanged between Murad and
plaintiffs/appellants was conducted through the corporation.
 Accordingly, Irvine did not produce any evidence at trial
from which the jury could reasonably conclude that her personal
damages were a probable and foreseeable consequence of Murad's
infomercial.  Irvine's individual claim must be DISMISSED for
having failed to meet her burden of proof.

                           CONCLUSION
 Accordingly, the judgment in IRG's favor is vacated and
Law 75 claim is remanded for a new trial.  Further, we direct the
district court to set aside the judgment regarding Irvine's
individual claim and enter judgment as a matter of law in the
appellant's favor on this claim.  All parties shall bear their own
costs.

</body>

</html>